FORT WORTH & DENVER RAILWAY
COMPANY, et al.

v.

Neil E. GOLDSCHMIDT, et al.

Civ. A. No. CA 4–80–258–E.

United States District Court,
N. D. Texas,
Fort Worth Division.

June 23, 1981.

N. Dennis G. Lyons, Charles H. Cochran, Washington, D. C., John A. Gilliam, C. Rodney Acker, Dallas, Tex., for plaintiffs.

Lawrence M. Mann, Washington, D. C., Joseph N. Boudreaux, Dallas, Tex., for intervenor.

Thomas H. Peebles, Dept. of Justice, Civil Div., Washington, D. C., Richard B. Vance, Asst. U. S. Atty., Fort Worth, Tex., for defendants.

## MEMORANDUM AND ORDER

MAHON, District Judge.

There is pending before the Court motions for summary judgment filed by the plaintiffs, defendants, and intervenor. On December 17, 1980, a hearing on these motions was held before the Court. After careful consideration of the motions, briefs, and oral arguments, the Court makes the following ruling.

### I. Background

Plaintiffs, twenty-five railroads, and the Association of American Railroads ("AAR"), seek to set aside the revised Freight Car Safety Standards issued by Administrator of the Federal Railroad Administration ("FRA"), pursuant to his authority under the Federal Railroad Safety Act of 1970. 45 U.S.C. § 421 et seq. (hereinafter "FRSA").[1] These revised regulations, promulgated in December of 1979, embody the agency's substantive safety standards for railroad freight cars, and impose a standard of strict liability on the nation's railroads for any freight car found not in compliance with the regulations. 49 C.F.R. § 215 et seq.[2]

Plaintiffs have stated several objections to the revised regulations all of which are raised principally to contest the adoption of a strict liability standard. Plaintiffs' objections are as follows: (1) Congress could not constitutionally delegate (if in fact it did) to the FRA the power to choose the standard of legal liability, (2) the FRA lacks statutory authority to impose strict liability, (3) the FRA's strict liability regulation does not further the statutory purpose of promoting safety, (4) the FRA's penalty schedule is unlawful because it was published in violation of the notice requirements of FRSA and the Administrative Procedure Act ("APA") and (5) the FRA's penalty schedule is substantively defective because it is irrational, unsupported and inadequately explained in violation of the APA.

The defendants and intervenor challenged plaintiff's objections and claim that the revised regulations and penalty schedule are substantively lawful and that both have been lawfully adopted.

### II. Discussion

Plaintiff's objections can be grouped into two categories; those that challenge the regulations and those that challenge the penalty schedule. Part A of this section will discuss those objections that related to the regulations and Part B will discuss those objections that related to the penalty schedule.

### A. *Plaintiff's Objections to the Revised Regulations*

If the Court finds that the FRSA does not authorize the FRA to promulgate regu-

---

1. The Secretary of Transportation has delegated most of his powers under the FRSA to the Administrator of the FRA. 49 C.F.R. 1.49 (1980).

2. 49 C.F.R. § 215.7 (1980) provides:
   A railroad is subject to a penalty, as provided in Appendix B of this part, if it fails to comply with any provision of this part.

Former regulations required a scienter element before a railroad could be charged with a violation. 49 C.F.R. § 215.7 (1979) provides in part:
   (a) Any railroad that knows, has notice, or should have known that a railroad freight car that it operates has any component which is described as defective in this part is responsible for compliance with this section.

lations imposing strict liability, then it would be unnecessary to consider plaintiff's remaining objections to the regulations and penalty schedule. Thus, the Court will first decide whether Congress, through the FRSA, had delegated to the FRA the power to adopt strict liability regulations.

### 1. *The Scope of Power Delegated to the FRA*

It is a well-established axiom that an agency can only act within the scope of power that was delegated to it by the agency's enabling statute. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); *NLRB v. Wyman—Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Thus, if Congress when enacting the FRSA, had not intended to grant the FRA the authority to adopt regulations that impose strict liability, such action on the part of the agency would be unlawful.

To determine the scope of power delegated by Congress under the FRSA the Court must construe that part of the statute that defines that conduct which is to be deemed unlawful. That critical part of the FRSA is found in § 209(a). 45 U.S.C. § 438(a). Section 209(a) states:

It shall be unlawful for a railroad to disobey, disregard, or fail to adhere to any rule, regulation, order, or standard prescribed by the Secretary under this title.

Thus, the precise question facing the Court is whether the sequence of terms, "disobey, disregard, or fail to adhere," grants to the FRA the power to adopt regulations that impose a standard of strict liability.

In interpreting a statute, the overriding consideration is to give the statute a construction that is consistent with "the purpose Congress sought to serve." *Chapham v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). *See also United States v. National Broiler Marketing Ass'n.*, 550 F.2d 1380 (5th Cir. 1977) *aff'd*, 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978); *T. & S.F. Railway Co. v. United States*, 617 F.2d 485 (7th Cir. 1980). The purpose of the FRSA is stated in the preamble of the statute:

The Congress declares that the purpose of this Act is to promote safety in all areas of railroad operations and to reduce railroad related accidents, and to reduce deaths and injuries to persons, and to reduce damage to property caused by accidents involving any carrier of hazardous materials. 45 U.S.C. § 421.

Thus, the interpretation that this Court finally gives to the statute must conform with the statute's stated purpose.[3]

#### a. *Plain Meaning*

The starting point in the construction of a statute is the words that Congress had chosen to express its will. The plain meaning of those words is controlling and there is no need for the Court to invoke aids to construction, unless the plain meaning of those words, in the context of the statute, is ambiguous or the plain meaning is contrary to the clearly expressed legislative intent. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Aaron v. SEC*, 446 U.S. 680, 690, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976).[4] If

---

**3.** Congressional purpose or declaration of policy set out in the preamble of a statute provides a sound and acceptable basis for ascertaining the goals of a statute. *See e. g., American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 409–10, 87 S.Ct. 1608, 1615, 18 L.Ed.2d 847 (1967); *Globe Fur Dyeing Corp. v. United States*, 467 F.Supp. 177, 180 (D.C.D.C.1979) *aff'd*, 612 F.2d 586, 198 U.S.App.D.C. 91 (1980); *Lehigh & New Eng-*

*land Ry. Co. v. I.C.C.*, 540 F.2d 71, 79–80 (3rd Cir. 1976) *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977).

**4.** There has been some concern about whether the "plain meaning" doctrine is still a valid rule of construction. *See Church of Scientology of California v. United States Department of Justice*, 612 F.2d 417, 420–22 (9th Cir. 1979); Murphy, Old Maxims Never Die: The "Plain Mean-

the plain meaning of the phrase "disregard, disobey or fail to adhere" authorizes the adoption of regulations that impose strict liability on the railroads, and if one of the exceptions does not apply, this Court must not further question that result.

Both parties have exhaustively analyzed the origins and derivations of the words in question. Both have reached opposite conclusions as to whether the phrase "disregard, disobey or fail to adhere" authorizes the adoption of strict liability or if that phrase requires some form of scienter before a railroad could be charged with a violation of the statute.[5] Thus, it appears that the meaning of the phrase in question is not as plain as the parties contend.

The parties agree, and the Court along with them, that the words "disregard" and "disobey" plainly imply some form of scienter. However, the parties disagree as to the plain meaning of the phrase "fail to adhere." Therefore, the Court's discussion will focus on that phrase and principally the word "adhere."

*Webster's Third New International Dictionary* (1971),[6] gives six definitions for the word adhere, of which the following three are relevant to the Court's discussion: "to hold, follow, or maintain loyalty steadily and consistently (as to a person, group, principle, or way) . . . to be consistent or in accord. . . . to agree to join, bind oneself to observance (as of a treaty).[7]

The first definition, which uses the word "loyalty," implies a moral and conscious state of mind. One cannot be by mistake or accident loyal to an idea or standard. One would have to consciously adopt that idea or standard, in order to be loyal to it. By the same token, the third definition implies a conscious state of mind on the part of the actor. One has to know the subject matter of a contention before one could agree to it. Therefore, from the standpoint of these two definitions, it cannot be said that Congress intended that regulations may be adopted which impose strict liability.

However, there is not that same sense of a mental state in the second definition. "To be consistent or in accord" does not necessarily imply a conscious effort on the part of the actor. One can be consistent or in accord with a standard by mistake or accident. From this definition of "adhere," it can be said that Congress did intend that regulations could be adopted that impose strict liability.

From this analysis of the plain meaning of the word "adhere," the Court concludes that the plain meaning implies both a scienter and strict liability standard.[8] There-

---

ing Rule" and Statutory Interpretation in the "Modern" Federal Court, 75 Col.L.Rev. 1299 (1975). However, recent Supreme Court decisions appear to reaffirm the rule's validity. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Aaron v. SEC*, 446 U.S. 680, 690, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980). *Contra, Train v. Colorado Pub. Interest Research Group*, 426 U.S. 1, 23–24, 96 S.Ct. 1938, 1948, 48 L.Ed.2d 434 (1976). Since the Court will not rely solely on the plain meaning doctrine, it will not be necessary to rule on the doctrine's continued usefulness as a rule of construction..

Furthermore, the Court is also mindful that rules of statutory construction are merely aids in construction; they do not have the force of law and should not be invoked to frustrate the obvious intent of Congress. *Nat'l Passenger Corp. v. Nat'l Ass'n. of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); *Marshall v. Gibson's Products, Inc. of Plano*, 584 F.2d 668, 675 n. 9 (5th Cir. 1978).

**5.** The term "scienter" is used throughout this opinion to refer to a mental state embracing the situation where a railroad knew or should have known of a violation of a regulation.

**6.** The Supreme Court has sanctioned the use of the dictionary definitions as a way of determining the plain meaning of words of a statute. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976).

**7.** Those definitions referring to physical connection to an object are plainly not relevant. It makes no sense to speak of a railroad sticking like glue to a regulation.

**8.** This recalls Lewis Carroll's class advice on the construction of language:

" 'When I use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less' "

Through the Looking Glass, in the Complete Works of Lewis Carroll 196 (1939) as quoted in

fore, the word "adhere" and consequently the phrase "fail to adhere" is ambiguous in the context of the FRSA, and the Court finds that it is necessary to employ other rules of statutory construction.

### b. *Legislative History*

Because the plain meaning of the phrase "disobey, disregard, or fail to adhere" is ambiguous when used in the context of the FRSA, the Court turns to the legislative history of the FRA to determine whether it sheds any light on congressional intent as to the standard of liability to be imposed on the railroads.

█ In trying to discern congressional intent by examining the legislative history of a statute, the Court must primarily look to "the purpose the original enactment served, the discussion of statutory meaning in committee reports, the effect of amendments— whether accepted or rejected—and the remarks in debate in preceding passage." *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1080 (5th Cir. 1980).

*Tennessee Valley Authority v. Hill*, 437 U.S. 153, 172 n. 18, 98 S.Ct. 2279, 2291 n. 18, 57 L.Ed.2d 117 (1978).

It should also be noted that "fail to adhere" is not a term of art and the Court should not freely associate the most onerous standard of liability with that phrase when Congress could have used the term "strict liability" itself. The term "strict liability" is certainly not foreign to Congress. *See e. g.*, 30 U.S.C. § 185(x)(2) (The Secretary or agency head may, by regulation or stipulation, impose a standard of strict liability. . . .); 43 U.S.C. § 1653(c) ([T]he owner and operator of the vessel shall be strictly liable without regard to fault. . . .); 43 U.S.C. § 1814(a) ([T]he owner and operator of a vessel . . . shall be jointly, severally, and strictly liable. . . .).

It can be argued that Congress' failure to use such standardized language indicates that Congress intended not to grant the authority to adopt strict liability regulations. However, such an argument also has its counterpart. If Congress intended a scienter standard, it could have used terminology which normally implies such a standard. Such language is also not foreign to Congress. *See e. g.*, 7 U.S.C. § 6k(1) (if such futures commission merchant or agent knew or should have known. . . .); 11 U.S.C. § 1305(c) (if the holder of such claim knew or should have known. . . .); 19 U.S.C. § 1673b(e)(1)(A)(ii) (the person . . . knew or should have known. . . .); 28 U.S.C. § 2409a(f) (the plaintiff or his predecessor in interest

The purpose of the FRSA as stated in its preamble [9] would not be frustrated by an interpretation which allows the FRA to adopt regulations imposing strict liability. However, since it would require the Court to predict the general effectiveness of strict liability regulations in promoting safety in all areas of the railroad freight industry,[10] this Court will not venture a conclusion as to whether strict liability regulations are absolutely essential to carry out the purpose of the FRSA. It is enough to say that it would not be contrary to the purpose of the statute to allow the FRA to promulgate strict liability regulations.[11] Therefore, the Court finds that the purpose of the FRSA does not forbid strict liability regulations; however, analyzing the purpose does not provide much help in determining whether Congress intended that such regulations could be adopted.

The Committee reports are silent as to the meaning of the phrase "disobey, disregard, or fail to adhere." The reports also

knew or should have known. . . .). Thus, Congress' failure to use standardized language is an argument of equal weight to either side, and is therefore, inclusive as a showing of Congressional intent.

**9.** *See* note 3 and accompanying text *supra.*

**10.** Prior statutes regulating the railroad freight industry did impose strict liability; however, these statutes concentrated on isolated areas and not the wide range of subjects which are covered in the FRSA. *See e. g.*, *O'Donnell v. Elgin J. & E. Ry.*, 338 U.S. 384, 390, 70 S.Ct. 200, 204, 94 L.Ed. 187 (1949); *Myers v. Reading Co.*, 331 U.S. 477, 482, 67 S.Ct. 1334, 1337, 91 L.Ed. 1615 (1947); *Brady v. Terminal R.R. Ass'n*, 303 U.S. 10, 15, 58 S.Ct. 426, 429, 82 L.Ed. 614 (1938); *Chicago, Burlington & Quincy Ry. v. United States*, 220 U.S. 559, 31 S.Ct. 612, 55 L.Ed. 582 (1911); *Colorado Milling & Elevator Co. v. Terminal R.R. Ass'n*, 350 F.2d 273, 275 (8th Cir. 1965); *Virginian Ry. v. United States*, 223 F. 748, 752 (4th Cir. 1915).

**11.** Whether the regulatory scheme as actually adopted by the FRA, furthers the legislative goal of the statute, is a separate question that will be discussed below. *See* note 28 and accompanying text *infra.* The Court only decides at this point in the opinion that generally, regulations imposing strict liability are not contrary to the purpose of the FRSA.

lack any general discussion about the standard of liability to be imposed under the FRSA. It is clear however, from the committee reports that it was Congress' intent to broaden the scope of coverage of the earlier statutes concerned with railroad safety. *See* H.Rep.No.91–1194, 91st Cong., 2nd Sess. (1970), reprinted in [1970] U.S. Cong. & Admin.News 4104–08.[12] The earlier statutes were enacted to cover specific areas of concern, while the Congress intended the FRSA to cover all areas of railroad safety.

These earlier statutes, without question, imposed a standard of strict liability on the railroads.[13] It is presumed that Congress, in exercise of its legislative function, was aware of these earlier statutes and that they imposed such a standard. *See Baptiste v. Government of the Virgin Islands*, 529 F.2d 100 (3rd Cir. 1976); *American Dredging Co. v. Local 25, Marine Division, Intern. Union of Operating Engineers, AFL–CIO*, 338 F.2d 837 (3rd Cir. 1964) *cert. denied*, 380 U.S. 935, 85 S.Ct. 941, 13 L.Ed.2d 822 (1965); *United States v. Sanders*, 145 F.2d 458 (10th Cir. 1944); *Finberg v. Sullivan*, 461 F.Supp. 253 (E.D.Pa.1978); *Federal Electric Corp. v. Dunlop*, 419 F.Supp. 221 (M.D.Fla.1976). However, there is no mention in the committee reports that a lesser standard or even a different standard of liability was to be applied to violations of the FRSA. It surely would be logical for this Court to assume that Congress would have mentioned, if not discussed in detail, its intent to change the

standard of liability which had been applicable to railroad safety legislation for over 70 years. *See Bush v. Oceans International*, 621 F.2d 207, 211 n. 4 (5th Cir. 1980). From what little could be gleaned from Congressional silence in this case, it appears that it was Congress' intent to continue the long standing policy of imposing strict liability on railroads for violations of safety standards.[14]

Although there has been several amendments to the FRSA since 1970, there has been only two that affect the section in question. *See* P.L. 93–633, reprinted in [1974] U.S.Code Cong. & Admin.News, p. 2503. P.L. 96–423, reprinted in [1980] U.S. Code Cong. & Admin.News, preliminary print no. 10, Dec. 1980 [94 Stat. 1811]. These amendments did not, however, change the "disobey, disregard or fail to adhere" language.[15] Furthermore, the legislative history of the amendments are void of any discussion of contested language or of the standard of liability which that language represents. *See* [1974] U.S.Code Cong. & Admin.News, p. 7669; [1980] U.S. Code Cong. & Admin.News, p. 3830. Thus, subsequent amendments are of little value in this case, in determining whether Congress intended to authorize the FRA to adopt regulations imposing strict liability.

In support of their respective contentions, the parties rely heavily on statements by representatives of their particular organization or interest group made before

---

**12.** Prior to the enactment of the FRSA, there were several statutes dating back to 1893 pertaining to specific aspects of railroad safety, including the Safety Appliance Act (1893), the Hours of Service Act (1907), the Ash Pan Act (1909), the Signal Inspection Act (1910), the Accident Reports Act (1910), and the Locomotive Inspection Act (1911). *See also* note 10 *supra.*

**13.** *See* note 10 *supra.*

**14.** The Court is mindful that the "search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps—Howard Radio, Inc. v. FCC*, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942). As stated by the Fifth Circuit: "Silence may indicate only that the question never occurred to Congress at

all, or it may reflect mere oversight in failing to deal with a matter intended to be covered, or it may demonstrate deliberate obscurity to avoid controversy that might defeat the passage of legislation, ..." *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1085 (5th Cir. 1980). It is this Court's opinion that Congress' silence as to the standard of liability, can be partly attributed to each of the reasons as stated in the *Rogers* decision.

**15.** The purpose of the 1975 amendment to 45 U.S.C. § 438 was to impose civil penalties for violations of the "Accident Reports Act" (45 U.S.C. § 39). The principal purpose of the 1980 amendment was to add criminal penalties for making false reports under the FRSA.

congressional committees. To assess the weight [16] of these statements, it is necessary to analyze them in the context of the sequence of events which lead to the enactment of the FRSA.

Plenary railroad safety legislation had its beginnings in the 90th Congress as H.R. 16980 and S. 2436. On May 21–28 and June 3–4, 1968, the House of Representatives Interstate and Foreign Commerce Committee conducted hearings on H.R. 16980. However, the 90th Congress expired without any further action on the pending bill.

On April 22, 1969, soon after the 91st Congress convened, Senator Hartke introduced S. 1933.[17] Shortly before S. 1933 was introduced, Secretary of Transportation John Volpe established a task force on rail safety, which included members of rail management, rail labor, and state public utilities commissions. The purpose of the task force was to study rail safety problems and eventually draft proposed legislation.

On May 20–21 and July 14, 1969, the Senate Subcommittee on Surface Transportation held hearings S. 1933. Several members of the task force testified before the subcommittee, however no mention was made of the standard of liability to be imposed by the original version of S. 1933. It is important to note, for the discussion below, that the original version of S. 1933 contained the following language of liability:

It shall be unlawful for any common carrier . . . to use or permit to be used any facilities or equipment . . . unless any such facilities are . . . maintained . . ., in accordance with applicable rules, regulations, and minimum standards promulgated by the Secretary of Transportation.

This language closely follows the language of the earlier railroad safety legislation and the parties agree that this language clearly imposes a standard of strict liability.[18]

On September 12, 1969, a copy of the proposed legislation resulting from the task force's deliberations was submitted by the FRA to the Secretary of Transportation. It was this proposed bill which first contained the language "disobey, disregard, or fail to adhere." In a letter accompanying the draft bill, the Administrator of the FRA set forth the areas of disagreement among the members of the task force. In that letter the Administrator states that management opposed the draft legislation because it did not limit violations to "knowing and willful" violations. (A copy of this letter is attached as an exhibit to intervenor's motion.) Without carrying implications to the extreme, at most it could be implied from this statement that rail management wanted "actual knowledge" as the standard of liability. It is not an admission, as claimed by defendants and intervenor, that management interpreted "disobey, disregard or fail

**16.** It is a general rule that in interpreting a statute, testimony given at congressional hearings on contemplated legislation should not be accorded undue weight as an indication of legislative intent, since the views expressed by witnesses at congressional hearings are not necessarily the same as those of the legislators ultimately voting on the bill. *McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 493–94, 51 S.Ct. 510, 512, 75 L.Ed. 1183 (1931); *Austasia Intermodal Lines, Ltd. v. FMC*, 580 F.2d 642, 645 (D.C.Cir.1978). However, where a statute is "acknowledged to be, an agreement worked out between management and labor, and ratified by the Congress and the President, . . . statements of the spokesmen for the two parties made in the hearings on the proposed Act are entitled to great weight in the construction of the Act." *Chicago & North Western Ry. Co. v. United Transportation Union*, 402

U.S. 570, 576, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971).

Even though, in the present case, the final bill was not a joint draft bill, as in *United Transportation Union*, their respective views expressed before Congress should be accorded some weight, since both had a substantial impact on the final version of the bill. *See* S. 3061 as introduced by Senator Magnuson on October 22, 1969. (S. 3061 is the bill which is the result of the task force of which labor and management were members. Several provisions of S. 3061 were adopted as amendments to the bill which became law, including the liability section which contains that contested language of this suit.)

**17.** S. 1933, as amended, was the bill that finally became law.

**18.** *See* note 10, *supra*.

to adhere," as imposing strict liability. It is logical, as claimed by plaintiffs, that such opposition was based on interpreting the language in question as imposing a "should have known" standard of liability.

The task force's draft bill, was adopted by the Secretary of Transportation and became known as the administration bill. The administration bill was introduced by Senator Magnuson on October 22, 1969.

On October 28–29, 1969, the third and final round of hearings on S. 1933 were held by the Subcommittee on Surface Transportation. For the first time, witnesses at these hearings alluded to the standard of liability imposed by the "disobey, disregard or fail to adhere" language. Secretary Volpe, expressing reservations concerning the penalty level between S. 1933 and S. 3061, testified:

> S. 1933 also differs from the administration bill in the area of penalties. It would establish both a higher minimum and a higher maximum penalty by raising the minimum to $500 and the maximum to $1,000. This is clearly an area of judgment. *It is my judgment that, in a safety statute such as this, where a violation invokes the penalty without regard to the knowledge or willful action of the violator*, a minimum penalty of $500 is simply too high. Since existing maximum penalties in most of rail safety statutes are in the range of $200 to $250, the increase to $250 was sufficient in my opinion.

Senate Hearings at 340 (emphasis added).

Therefore, it could be implied from the Secretary's statement that both S. 1933 and S. 3061 imposed liability "without regard to the knowledge or willful action of the violator."

At the hearing, Mr. Thomas Goodfellow, President AAR, proposed a technical amendment, which also alludes to the standard of liability. He testified as follows:

> I should like to suggest one amendment of a technical nature that it required to clarify what was certainly the intent of the Task Force and what I believed Congress would also wish to do in enacting the bill.

Section 10(c) [of S. 3061], after providing for fines for violations of the bill, states that: "Each day of violation shall constitute a separate offense." *In theory, at least, the provision could lead to immense fines in circumstances where (1) a railroad had neither knowledge nor notice of a violation*; or (2) where the violation, though known, cannot be corrected immediately. We doubt that anyone desired a compounding of fines in such circumstances and we, therefore, suggest that the sentence be rewritten to read as follows:

> After notice from the Secretary of such violation and reasonable opportunity to correct the same, each day such violation continues shall constitute an additional separate offense.

*Senate Hearings* at 363 (This amendment was rejected by the Senate.)

It can be implied from Mr. Goodfellow's statement that he along with the Secretary felt that railroads could be held liable where it had no actual knowledge of the violation. However, it is not absolutely clear from either statement that they were referring to the legal standard of strict liability. As argued by plaintiffs, they could have been referring, in layman's terms, to the situation where the railroad lacked actual knowledge of a violation, but the violation is such that the railroad should have known of it (constructive knowledge). Since the witnesses could have been referring to a situation where the railroads had constructive knowledge of a violation, their statements before the committee shed little light on Congressional intent.

On December 18, 1969, the Senate Committee on Commerce reported favorably a comprehensive rail safety bill. S.Rep.No. 91–619, 91st Cong., 1st Sess. (1969). The reported bill contained the "disobey, disregard or fail to adhere" language and not the original language of liability. *See* p. 11, *supra*. On December 19, 1969, S. 1933 was passed by the Senate.

The House of Representatives' deliberations of its version of S. 1933 provide little

additional indications that Congress questioned or studied the issue of the standard of liability. The AAR again made a request that the bill be amended to require knowledge or notice before imposition of penalties. *See Hearings Before the Committee on Transportation and Aeronautics of the Committee on Interstate and Foreign Commerce on H.R. 7068, H.R. 14417 and H.R. 14478,* 91st Cong. 2d Sess. 86–87 (1970). However, this amendment was not adopted by the House. Like the attempted amendment in the Senate, the House version of the amendment sheds little if no light on Congressional intent.

Thus, at the committee hearings, there is no conclusive or expressed statement which indicates that Congress considered the issue of the standard of liability.

Because of the lack of conclusive indications of expressed Congressional intent, the parties have presented to the Court several theories, of which the parties claim plainly show Congressional intent. The Court has made an independent search and has not found one case holding that such theories should be given any weight in determining Congressional intent. However, the Court will summarily review these theories in an attempt to thoroughly review all of the claims of the parties.

1. Plaintiffs claim that the administration bill's language of liability (disobey, disregard or fail to adhere) is the result of a compromise between the strict liability language of S. 1933 as originally introduced and the actual knowledge language which the AAR requested. Defendants claim that the change in language was made in an attempt to use modern drafting techniques to insure that all safety related activity would be covered by the law and that the change had no effect on the standard of liability.

There is no express statement in the legislative history which supports either theo-

ry.[19] Since each theory is plausible, the Court finds that they are inclusive as a showing of Congressional intent.

2. Plaintiffs make a very unclear argument that somehow the words "disobey" and "disregard" are specific words, while "fail to adhere" is a general phrase. Therefore, plaintiffs argue the rule of *ejusdem generis* should apply so that "fail to adhere" would have the same meaning as "disobey" or "disregard." Plaintiffs conclude that since it is agreed by the parties that "disobey" and "disregard" imply a scienter requirement, "fail to adhere" should also carry a scienter requirement.

Defendants claim that the sequence of words represents an increasing standard of liability. "Disobey" implies actual knowledge, "disregard" implies constructive knowledge, and "fail to adhere" implies a "strict liability" knowledge (i. e. no knowledge).

Plaintiffs' *ejusdem generis* theory lacks any merit. By no stretch of the meaning of the words "disobey" and "disregard" could they be said to be "specific" nor could the meaning of "fail to adhere" be said to be "general." By its very definition, the rule of *ejusdem generis* plainly does not apply. *See Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980).

Although defendants' theory of increasing standard of liability seems logical, there is no legislative history to support it.

3. Plaintiffs claim that whenever the courts have upheld a standard of strict liability, they always have done so on the basis of a clearly expressed legislative intent to impose such liability. *St. Louis & Iron Mountain Railway v. Taylor,* 210 U.S. 281, 294–95, 28 S.Ct. 616, 620–21, 52 L.Ed. 1061 (1908); *Chicago, Burlington & Quincy Railway v. United States,* 220 U.S. 559, 570, 31 S.Ct. 612, 613, 55 L.Ed. 582 (1911); *United States v. Park,* 421 U.S. 658, 673, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975).

---

**19.** There are statements in the legislative history which indicate that the final bill was the result of compromise, *House of Representative Hearings* at 34; Statement of Representative Pickle, 116 Cong.Rec. H–7876 (Aug. 6, 1970).

However, there is no express statement that a compromise was reached on the standard of liability. Surely, if there was such a compromise, it would have been debated in the committee hearings.

Although in the cases cited by plaintiff, the courts may have stated that Congress clearly intended that a strict liability standard was intended, those decisions do not hold that it is mandatory that Congress clearly expressed such intent. After an independent search, this Court has not found a decision expressing such an absolute rule.

This Court is charged with the duty of interpreting the language in question. Obviously, if Congressional intent was clearly expressed, the Court's task would be easier. Just because the members of Congress may have been less than specific in stating their intent, does not require this Court to rule out a possible interpretation of § 209(a) as authorizing regulations which impose strict liability.[20]

4. Plaintiffs make the argument that Congress' decision not to repeal the earlier statutes effecting railroad safety[21] is an indication that Congress did not intend the FRSA to authorize strict liability as a standard of liability. Plaintiffs premise this argument on the bases of labor's opposition to the repeal of the prior statutes. Plaintiffs argue that labor opposed repeal of the prior statutes because labor felt that the FRSA would replace the prior statutes' requirement of strict liability with regulations which would not impose strict liability.

Labor, whose interest is represented by the intervenor, vigorously rejects plaintiffs' theory. Labor states that it opposed the repeal of the prior statutes, not because of any difference in the standard of liability between the FRSA and prior law, but because labor feared that the FRA would either relax the standards of the prior statutes or that the FRA would fail to adopt regulations covering the areas addressed by the prior statutes. There is no direct statement by any labor representative expressing the view that labor opposed the FRSA because it did not authorize strict liability as a standard of liability.[22]

Because labor's own explanation for its opposition to the repeal of the prior statutes is equally plausible as plaintiffs' theory, plaintiffs' theory carries little weight, if any, in determining Congressional intent.

The Court finds that all of these theories are inconclusive as a showing of Congressional intent, either because they lack merit altogether, or because there is an equally plausible counter theory. Moreover, the Court is reluctant to assign a particular intent to Congressional silence, based upon the mere speculations and assumptions of the parties. As declared by Justice Robert Jackson in support of a preference for making decisions "by analysis of the statute instead of by psychoanalysis of Congress":

> When we decide from legislative history, including statements of witnesses at hearings, what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them. Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not interpretation of a statute but creation of a statute.

*United States v. Public Utilities Commission of California,* 345 U.S. 295, 319, 73 S.Ct. 706, 719, 97 L.Ed. 1020 (1953) (Jackson, J. concurring).

c. *Administrative Interpretation.*

For seven years, between the time of its promulgation of the original regulations under the FRSA in 1973 and the time of its promulgation of the amended regulations here in issue in December 1979, the FRA adhered to and enforced a liability policy based on a "knew or should have known" standard. Plaintiffs argue that this first

---

**20.** *In determining whether certain sections of the securities laws justify liability without a scienter requirement, the Supreme Court stated that the language of the statute must be "sufficiently clear."* Aaron v. SEC, *446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980). There was no requirement that it be absolutely clear.*

**21.** *See* notes 10 and 12, *supra.* H.Rep.No.91–1194, 91st Cong. 2nd Sess. (1970), reprinted in [1970] Cong. & Admin.News 4114.

**22.** *See generally,* Senate Hearings on S. 1933, *supra* at 368–70; *House Hearings on H.R. 7068, supra* at 146–152.

interpretation of the standard of liability authorized by the FRSA is entitled to deference on judicial review. Moreover, plaintiffs argue that this initial interpretation is entitled to great weight because it was a contemporaneous construction, made soon after the time of enactment and such interpretation has been consistently applied for a seven year period. Plaintiffs conclude by implying that based upon these set of circumstances, the Court should reject the 1979 interpretation and accept the 1973 interpretation.

■ Plaintiffs' argument is a misleading interpretation of the law. The proper starting point is the 1979 regulations. It is these regulations which are entitled to "great deference." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Investment Co. Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Whether the 1979 regulations are given "peculiar" weight depends on whether they are the result of a contemporaneous construction or whether they have been consistently applied. *Zenith Radio Corp, supra* 437 U.S. at 450–58, 98 S.Ct. at 2445–49. *General Electric Co. v. Gilbert*, 429 U.S. 125, 142–43, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976). Therefore, a correct statement of the law is that agency regulations which interpret an enabling statute deserve great deference by a reviewing court, and such interpretation is given a peculiar weight when the regulations are adopted contemporaneously with enactment of the enabling statute or where the agency has given a consistent interpretation of the enabling statute.

Surely the law is not what plaintiffs imply. Agencies are not forbidden to revamp, revise or even reject prior regulations, when it has determined that the prior regulations are no longer responsive to the problems that the agency is statutorily directed to remedy. *American Trucking v. A.T. & F.R. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). The Court has to assume that the FRA changed its regulatory scheme, not based on some whim, but because the FRA, relying on its expertise in the field of railroad safety, determined that a new regulatory scheme would be more efficient in meeting the goal of the FRSA. It is an anomalous argument to say that a regulatory scheme's shortcomings should be used against an agency when it tries to rectify those shortcomings. This Court has to assume that the FRA relied on its expertise to determine that strict liability regulations would be more beneficial in promoting railway safety than "knew or should have known" regulations. *See United States v. Articles of Drug*, 625 F.2d 665, 672 (5th Cir. 1980).

Therefore, in adopting regulations which impose a strict liability standard, the FRA interpreted the FRSA as authorizing such regulations. It is this interpretation which the Court is bound to give great deference. *Zenith Radio Corp. supra*, 437 U.S. at 450, 98 S.Ct. at 2445. *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 134 n. 25, 97 S.Ct. 965, 978 n. 25, 51 L.Ed.2d 204 (1977). There is no case holding that a lesser weight or no weight should be afforded such an interpretation, merely because it is not consistent with prior regulations which simply were not adequate.

Moreover, the 1973 and 1980 regulations are not inconsistent. The FRA did not say in 1973 that it was adopting regulations to the fullest extent as authorized by the FRSA. At most it could be implied that the FRA determined that a "knew or should have known" standard was more appropriate in that early stage of development of the FRSA. If plaintiffs' argument is carried to the extreme, every time an agency decides not to use its full statutory power, such a decision, based on conditions then present, would forever forbid the agency from exercising its full power in the event changed conditions so warrant.

Obviously the FRA cannot adopt strict liability regulations, if doing so exceeds its statutory authority. The Court only holds that merely because the FRA decided to change its regulatory scheme, cannot be

used as an indication that the FRA is now exceeding its statutory authority.

Further weakening plaintiffs' argument and strengthening the conclusion that 209(a) authorizes both scienter and a strict liability standard is the fact that the FRA has issued various emergency orders and some regulations which did not contain a scienter element.[23] Therefore, the FRA has not consistently interpreted § 209(a) as authorizing only regulations which impose a scienter requirement. In fact, it appears more likely that the FRA interpreted § 209(a) as authorizing regulations with a scienter element and regulations without a scienter element.

Plaintiffs further make the argument that Congress impliedly acquiesced in the 1973 regulatory interpretation of the standard of liability, by failing to object to that interpretation when Congress amended § 209(a) in 1975.[24] *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975); *National Lead Co. v. United States*, 252 U.S. 140, 147, 40 S.Ct. 237, 239, 64 L.Ed. 496 (1920).

However, plaintiffs neglect to point out that the regulations in question were published as final on December 31, 1979 and that five months later Congress again amended § 209(a).[25] Congress again failed to object to FRA's interpretation of § 209(a). Therefore, if anything is to be gleaned from this Congressional inaction, it is that Congress acquiesced in the interpretation of § 209(a) as authorizing either a "knew or should have known" standard or a strict liability standard.

■ In the final analysis, when reviewing statutory construction, the Court merely looks to see if the agency's construction

**23.** *Emergency Order No. 1*, 37 Fed.Reg. 19840 (1972) imposed a civil penalty of not less than $250 nor more than $2,500 to be assessed for use of certain mail cars found to have defective center sills. *Emergency Order No. 2*, 37 Fed. Reg. 28311 (1972) imposed the same penalty and prohibits the use of certain tank cars that were structurally infirm. *Emergency Order No. 3*, 38 Fed.Reg. 21952 (1973) established absolute conditions for the transportation of Class A explosives. *Emergency Order No. 4*, 39 Fed.Reg. 27947 (1974) prohibited the use of certain Penn Central trackage found to be defective through FRA inspections. *Emergency Order No. 5*, 39 Fed.Reg. 38230 (1974) established absolute conditions in the handling of DOT tank cars containing flammable compressed gas. *Emergency Order No. 6*, 42 Fed. Reg. 62243 (1977) prohibited service over a particular line of the Illinois Central Gulf Railroad in response to safety defects in the signal system. *Emergency Order No. 7*, 43 Fed.Reg. 12691 (1978) established absolute conditions on the use of freight cars with certain "high carbon content wheels." *Emergency Order No. 8*, 43 Fed.Reg. 18396 (1978) prohibited the use of defective trackage of a certain railroad for hazardous material traffic. *Emergency Orders No. 9 and 10*, 43 Fed.Reg. 22474, 51888 (1978), involved Consolidated Rail Corporation lines and were similar in all aspects to Emergency Order No. 8. *Emergency Order No. 11*, 44 Fed.Reg. 8401 (1979) imposed absolute requirements concerning the transportation of hazardous materials by the Louisville & Nashville Railroad.

49 C.F.R. § 217 requiring the filing of operating rules and testing employees; 49 C.F.R. § 218 concerns worker "blue signal" protection; 49 C.F.R. § 220 imposes radio operating standards; 49 C.F.R. § 221 requiring rear end marking devices.

Plaintiffs make the argument that since emergency orders are issued pursuant to § 203 and not § 202, the emergency orders should not be given any weight as a showing of the FRA's interpretation of § 209(a). This argument lacks any merit. Sections 202 and 203 grant the FRA the power to adopt regulations and orders and § 209(a) defines the standard of liability for violations of regulations and orders issued pursuant to both §§ 202 and 203. Therefore, if "fail to adhere" authorizes strict liability emergency orders, it also authorizes strict liability regulations.

Plaintiffs further contend that because of the nature of these emergency orders and regulations, it is not unfair to impose a strict liability standard. However, this argument addresses the reasonableness of the revised regulations as adopted. This point will be considered below. Furthermore, this argument has no bearing on whether § 209(a) authorizes the FRA to adopt the regulations in question. Surely plaintiffs are not arguing that § 209(a) authorizes strict liability emergency orders and some strict liability regulations, but does not authorize the strict liability regulations which are the subject of this suit.

**24.** See note 15 and accompanying text *supra*.

**25.** *Id.*

of the statute is reasonable. "It is settled that courts should give great weight to *any reasonable construction* of a regulatory statute adopted by the agency charged with the enforcement of that statute." *Investment Co. Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971). *See also, Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Florida East Coast Ry. Co. v. United States*, 623 F.2d 391, 394 (5th Cir. 1980).

The Court finds that the language of the FRSA could allow strict liability regulations and that there is no expressed or conclusive statement in the legislative history which would disallow such a construction. Furthermore, considering the long history of strict liability in federal railroad safety legislation, the Court finds that the FRA's interpretation of the FRSA as authorizing the adoption of strict liability regulations is reasonable. Therefore, this Court will give great deference to that interpretation.

d. *Summary on Congressional Intent*

Although there is neither an expressed statement nor any absolutely clear indication from Congress that it intended to authorize a standard of strict liability, the Court does find the following:

1. The plain meaning of the phrase "fail to adhere," although ambiguous as used in the context of § 209(a), would support an interpretation that a scienter element is not required for violations of regulations adopted by the FRA.

2. Since the official committee reports are silent as to the standard of liability, it is likely that Congress intended to continue the long standing policy of a standard of strict liability for violations of railroad safety legislation.

3. The FRA did adopt, prior to the 1979 revised regulations, emergency orders and regulations that did not require a scienter element; therefore, the FRA has interpreted § 209(a) as authorizing a standard of liability that does not require a scienter element. Moreover, the FRA, by adopting the revised regulations, interprets § 209(a) as authorizing strict liability regulations, and the Court gives great deference to that interpretation.

Therefore, based upon these factors and the foregoing review of the indicia of Congressional intent, the Court finds that § 209(a) of the FRSA does authorize the FRA to adopt regulations which impose a standard of strict liability.

2. *Constitutional Delegation of Authority*

■ Since the Court has determined that § 209(a) authorizes the FRA to adopt regulations that impose a standard of strict liability or a lesser standard of liability, the Court must determine whether such a delegation is constitutional.

Plaintiffs argue that by delegating the authority to promulgate either strict liability regulations or regulations with a lesser standard of liability, Congress has abdicated or transferred "to others the essential legislative functions with which it is thus vested." *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 843, 79 L.Ed. 1570 (1935).

The Court finds that plaintiffs' argument is without merit. Justice Marshall confronted a similar argument with the following statement:

The notion that the Constitution narrowly confines the power of Congress to delegate authority to administrative agencies, which was briefly in vogue in the 1930's, has been virtually abandoned by the Court for all practical purposes, at least in the absence of a delegation creating "the danger of overbroad, unauthorized, and arbitrary application of criminal sanctions in an area of [constitutionally] protected freedoms," *United States v. Robel*, 389 U.S. 258, 272 [88 S.Ct. 419, 428, 19 L.Ed.2d 508] (1977) (Brennan, J., concurring). This doctrine is surely as moribund as the substantive due process approach of the same era—for which the Court is fond of writing an obituary, *e. g.*, *Ferguson v. Skrupa*, 372 U.S. 726 [83 S.Ct. 1028, 10 L.Ed.2d 93] (1963); *North Dakota Pharmacy Board v. Snyder's Stores*, 414 U.S. 156 [94 S.Ct. 407, 38 L.Ed.2d 379] (1973)—if not more so.

*National Cable Television Association, Inc. v. United States*, 415 U.S. 336, 352–54, 94

S.Ct. 1146, 1155, 1156, 39 L.Ed.2d 370 (1974) (footnotes omitted).[26]

The Court finds that the FRSA clearly declares a policy and standard of action for the FRA to follow; therefore, the delegation of power to promulgate scienter or non-scienter regulations is constitutional. *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).[27]

### 3. Reasonableness of the Revised Regulations

■ Having determined that Congress had delegated to the FRA the power to promulgate strict liability regulations and that such delegation was constitutional, the Court now considers whether the revised regulations are reasonably related to the purpose of the FRSA.

The revised regulations were adopted pursuant to § 202 of the FRSA. That section specifically states that regulations must be promulgated in accordance with the provisions of § 553 of Title 5 (APA). Section 706 of the APA governs judicial review of regulations promulgated in accordance with the provisions of § 553. Section 706(2)(A) provides that such regulations will be held unlawful if the court finds them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [28]

In determining whether the promulgation of a regulation was arbitrary and capricious it is simply the Court's function to ascertain whether the regulations were based on a consideration of the relevant factors. The Court is not to substitute its judgment for that of the agency, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and the Court's determination is to be made on the administrative record and not by de novo review. *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). If the regulations are "reasonably related to the purpose of the enabling regulation," this Court ordinarily will not set them aside. *Thorpe v. Housing Authority*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *see also Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973); *Arkansas Pharmacists Association v. Harris*, 627 F.2d 867, 870 (8th Cir. 1980); *Johnson's Professional Nursing Home v. Weinberger*, 490 F.2d 841, 844 (5th Cir. 1974).

After careful review of the administrative record, it is plainly evident that the FRA considered the viewpoints of all those who would be affected by the change in the standard of liability.[29] Furthermore, the record shows that the FRA considered many of the arguments which plaintiffs raise in their motion.[30] Even a cursory review of the administrative record shows that the FRA conducted an indepth investi-

**26.** "Despite the futility, counsel often cite [*Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)] ... in briefs, but the courts uniformly uphold the delegations. *E. g.*, *United States v. Davis*, 564 F.2d 840, 844 (9th Cir. 1977) *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978); *United States Postal Service v. Brennan*, 574 F.2d 712, 716 (2nd Cir. 1978) *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979). Such briefs waste the client's money and waste the courts' time." 1 K. Davis, *Administrative Law Treatise* § 3.8 (2nd ed. 1978, supp. 1980).

**27.** Plaintiffs argue that the Court should construe the FRSA narrowly to avoid the constitution delegation question. However, there is no reason to construe the statute in an artificially narrow way to avoid non-existent constitutional difficulties.

**28.** The Court has already determined that § 706(2)(B) and (C) have been met. Section 706(2)(E) and (F) are not applicable to this case.

**29.** The public docket of the rule making proceeding contains comments from fourteen railroads, the AAR, the rail unions, private car owners and shops, four state agencies participating in safety inspection activities under section 206 of the FRSA, manufacturers of freight car components, Federal agencies, and members of Congress (on behalf of constituents).

**30.** The FRA even conceded to the AAR by modifying the regulations to avoid having a railroad held responsible for defective cars being operated over its line by another railroad under a truckage rights agreement. 44 Fed. Reg. 77332. The FRA also modifying the regulations concerning cars delivered but not yet accepted in interchange. 45 Fed.Reg. 26710.

gation of the problems of railroad safety and of the solutions of those problems. This Court would therefore be justified in upholding the regulations as reasonable. *See Citizens to Preserve Overton Park v. Volpe, supra.* However, in the interest of addressing all the issues, the Court will review plaintiffs' contentions.

Plaintiffs contend that a regulatory system under which the railroads would no longer be required to effect inspections of their cars on a mandatory basis should be the counterweight for regulations which impose strict liability. Plaintiffs argue that the FRA's decision to retain mandatory inspections was also a defacto decision not to adopt a standard of strict liability and that it was "simple administrative inertia" that kept the FRA from abandoning its proposal of strict liability. This argument is clearly contradicted by the record. The record shows that the FRA reconsidered the requirement of mandatory inspections in view of the statements of the majority of the comments made at hearings on the proposed regulations. 44 Fed.Reg. 77331. Furthermore, it is clearly evident that the FRA considered the requirement of inspections in relation to the standard of strict liability.[31]

Plaintiffs further contend that strict liability will allow the FRA to assess more fines and that since there has never been demonstrated any relationship between the level of safety and the level of fines, the imposition of a standard of strict liability is unreasonable. However, there is no statement in the administrative record to support such a conclusion.[32] The record shows

that the decision to adopt a standard of strict liability was made so as to improve compliance by the railroads of the safety regulations and not merely for purpose of collecting more fines. *See* 44 Fed.Reg. 77339.

Plaintiffs further argue that strict liability regulations will divert railroad inspection resources from out-bound predeparture inspections to in-bound inspections. Plaintiffs claimed that since out-bound inspection better serve the purposes of the FRSA, a standard of strict liability, which emphasizes in-bound inspections, should be rejected. However, the FRA took this consideration into account and stated that:

FRA recognizes that inbound inspection of cars is a highly efficient means of facilitating the repair of defective cars in many settings. However, FRA does not believe that an inflexible Federal requirement is appropriate. Rather, it believes that safety will be better served if attention is focused on the pre-departure inspection, which could be conducted on an inbound or outbound basis. Moreover, since the railroads will be held strictly liable for critical "running" defects and high penalties will be imposed for dispatching cars with these defects, there will be substantial motivation for railroads to find and repair defective cars before they are placed in outbound trains.

\* \* \* \* \* \*

Finally, FRA believes that if adequate predeparture inspections are conducted and defective cars are tagged and re-

---

**31.** In the background information to the final revised regulations the FRA stated in part:

Moreover, since the railroads will be held strictly liable for prohibited defects on all freight cars in service, FRA does not believe that the timing of the predeparture inspection is critical, so long as it is conducted before a car is dispatched. Thus, § 215.13 of the final rule provides that the inspection shall be performed at each location where a freight car is placed in a train. This inspection may be made before or after the car is placed in the train.
44 Fed.Reg. 77331.

**32.** Plaintiffs rely on a statement by Rolf Mowatt-Larssen, FRA's Director, Office of Standards and Procedures, in which he explained:

Under the proposed rule we would not have to notify the carriers or establish the knowledge. Thus, if an inspector went in and found a car which was defective, he would have the option of saying this is a defective car and it is in violation.

We believe we would be able to have more resources available without having to go over it several times.

This is merely a statement that strict liability would conserve FRA resources. For this, the FRA should be commended not condemned.

paired or removed from service, very few defects will occur during the conduct of normal operations. However, if these defects do develop during operations, a railroad can protect itself from liability by tagging the defective car and moving it for repair as prescribed in § 215.9 or removing it from service. Railroad inspection forces greatly outnumber the FRA and participating State inspectors engaged in monitoring railroad compliance with the Freight Car Safety Standards. If railroads effectively utilize their inspection forces, they are much more likely to find these defects before a Federal or State inspector would. Therefore, the strict liability provision has been retained in § 215.7 of the final rule. 44 Fed.Reg. 77331–32.

Therefore, it is to the railroads own advantage that they continue outbound inspections, especially in light of the strict liability regulations. Therefore, plaintiffs' contention that outbound inspections will be de-emphasized is not warranted.

Plaintiffs finally argue that the revised regulations impose a standard of strict liability for the *possession* of a defective car, whereas the prior safety statutes impose such liability only for the *use* of a defective car. Plaintiffs argue that such a change in the scope of liability from prior law is somehow "absurd." However, as explained by the FRA, the change in scope of liability was made to remedy a situation which had occurred under the prior law. Under the prior law, before a railroad could be held liable for certain violations the railroad had to be permitted to use the defective car. The change in the scope of liability would allow the FRA to cite railroads for violations before a particular defective car is used, therefore, the public would not be exposed to hazard unnecessarily. *See* 44 Fed.Reg. 77339. The Court finds nothing absurd in such a change in the scope of liability.

After reviewing the administrative record, the Court finds that the revised regulations are neither arbitrary nor capricious and that the revised regulations are reasonably related to the purpose of the FRSA.

B. *Plaintiff's Objections to the Revised Penalty Schedule.*

Section 209(b) of the safety Act requires FRA to "include in, or make applicable to," any rule issued under that statute a civil penalty ranging from $250 to $2,500 for each violation of its provisions. The establishment of the appropriate penalty for the particular rule violation, as long as the amount falls within the above range, is committed wholly to the discretion of FRA.

Plaintiffs raise two objections to the penalty schedule that the FRA promulgated to coincide with the revised regulations. Plaintiffs contend that the FRA failed to give adequate notice of the FRA's intention to revise the penalty schedule and that the penalty schedule that did go into effect is arbitrary, unexplained and unsupported.

1. *Adequate Notice*

Section 553(c) of the APA provides in pertinent part:

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

This provision does not require precise notice of each aspect of the penalty schedule to be adopted but only mandates that the public have "a reasonable opportunity to participate in the rule making process." *Forester v. Consumer Product Safety Commission,* 559 F.2d 774, 787 (D.C.Cir.1977). *See e. g. Action for Children's Television v. FCC,* 564 F.2d 458, 470 (D.C.Cir.1977); *South Terminal Corp. v. EPA,* 504 F.2d 646, 656–59 (1st Cir. 1974); *California Citizens Bank Assn. v. United States,* 375 F.2d 43, 48–49 (9th Cir.), *cert. denied* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

There is no question that the FRA gave adequate notice to the public that it intend-

ed to revise the penalty in conjunction with the revision of the substantive regulations. *See* 44 Fed.Reg. 1420–21, 1427.[33] Therefore, the Court finds that plaintiffs' claim that the FRA did not give adequate notice is without merit.

### 2. *Reasonableness of the Revised Regulations*

■ Section 209(c) provides that the FRA shall assess a penalty, "not less than $250 nor more than $2,500, *as he deems reasonable.*" (emphasis added). Therefore, from the very language of the statute, it is clear that Congress intended that the FRA be allowed wide discretion in establishing the actual penalty level. This Court is therefore, extremely reluctant to substitute its judgment for that of the agency. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Council,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). *See also Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). Plaintiffs do not contend that the penalties established are unreasonable or completely an abuse of the FRA discretion. Plaintiffs' main contention appears to be that the FRA failed to explain how they determined the particular level of penalties.

It is true that the FRA in promulgating the revised penalty schedule is required by the APA to incorporate a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c). The purpose of requiring such a statement is to enable courts, which have the duty to exercise review, to be aware of the legal and factual framework underlying the agency's action. *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *American Standard, Inc. v. U.S.,* 602 F.2d 256, 269 (Ct.Cl. 1979). However, "[W]hen promulgating a rule, an agency is not required to abide by the same stringent requirements of fact finding and supporting reasons which apply to adjudication." *Florida Sugar Cane League, Inc. v. Usery,* 531 F.2d 299, 303 (5th Cir. 1976), *quoting Mobil Oil Corp. v. FPC,* 152 U.S.App. 119, 469 F.2d 130, 139, *cert. denied* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973). In relation to determining penalties, which are akin to policy decision, all that is required are "adequate reasons and explanations, but not 'findings' of the sort familiar from the world of adjudication." *Amoco Oil Co. v. EPA,* 501 F.2d 722, 740–41 (D.C.Cir.1974). *See also* 1 K. Davis, *Administrative Law Treatise* § 6.12 (2nd ed. 1978, supp. 1980).

After reviewing the supplemental remarks of FRA in issuing the revised penalty schedule, 44 Fed.Reg. 77339, the Court finds that FRA has sufficiently stated the factual framework underlying its determination of appropriate penalties. The Court further finds that the FRA neither abused its discretion nor acted arbitrarily in establishing this particular penalty schedule.

Therefore, the Court finds that plaintiffs' challenge to the revised penalty schedule is without merit.

### III. *Conclusion*

Based on the foregoing discussion, the Court ORDERS that plaintiffs' motion for summary judgment is DENIED. The Court further ORDERS that defendants' and intervenor's motions for summary judgment are GRANTED.

---

**33.** In its Notice of Proposed Rulemaking (NPRM), FRA explicitly stated its intention to amend the freight car penalty schedule at the time the amendments to those regulations became final:

FRA will include in the amendment based on this proposal a revised penalty schedule equating the amount of penalties to be assessed with the nature and degree of violations.

44 Fed.Reg. 1421.