WESTERN COAL TRAFFIC LEAGUE and its Members, et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

Nos. 81–4257, 81–4259, 81–4277, 81–4299, 81–4334, 81–4347, 81–4354, 81–4357, 81–4365 to 81–4369, 81–4373, 81–4415, 81–4423 and 82–4021.

United States Court of Appeals, Fifth Circuit.

Nov. 14, 1983.

Law 96–452 October 14, 1980.

Richard A. Allen, Gen. Counsel, Timm L. Abendroth, Henri F. Rush, ICC, William F. Smith, Atty. Gen., U.S. Dept. of Justice, John J. Powers, III, James H. Laskey, Antitrust Div., Washington, D.C., for respondents in all cases.

J. David Forsyth, Cicero C. Sessions, New Orleans, La., William L. Slover and Donald J. Avery, Washington, D.C., for Western Coal Traffic League and Its Members, et al.

C. Michael Loftus, Washington, D.C., for Western Coal Traffic League and Its Members, et al., Consumer Owned Power Coalition, Eastern Coal Transp. Conference,

Western Coal Traffic League and Its Members.

J. Raymond Clark, Mary Todd Foldes, Washington, D.C., for Arkansas-Missouri Power Co., et al.

Edward B. Poitevent, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Arkansas-Missouri Power Co., et al. and Middle South Utilities.

John M. Cleary, Nicholas J. DiMichael, Washington, D.C., for Gulf States Utilities Co., et al.

Dickson R. Loos, Barry Roberts, Washington, D.C., for The Aluminum Ass'n, Inc.

John Guandolo, Washington, D.C., for Consumers Power Co.

Charles J. McCarthy, Washington, D.C., for Commonwealth Edison Co., et al.

Leonard M. Trosten, Harry H. Voigt, Michael F. McBride, Daniel J. Conway, Washington, D.C., for Edison Elec. Institute.

John F. Donelan, John K. Maser, III, Washington, D.C., for American Paper Institute, Inc., The National Indus. Traffic League, Carolina Power & Light Co., et al.

John H. LeSeur, Slover & Loftus, Washington, D.C., for Consumer Owned Power Coalition, and Eastern Coal Transp. Conference.

Edmund E. Harvey, Washington, D.C., for Copper Development Ass'n, Inc.

R. Dennis Wright, Mark G. Flaherty, Kansas City, Mo., for Nebraska Public Power Dist.

Harold E. Spencer, Richard S.M. Emrich, Chicago, Ill., for International Minerals & Chemical Corp. and The Fertilizer Institute.

John R. Molm, Atlanta, Ga., for Alabama Power Co., et al.

John L. Oberdorfer, Washington, D.C., for National Coal Ass'n & Chemical Mfrs. Ass'n.

Paul M. Donovan, Washington, D.C., for The Chlorine Institute, Inc.

Mike Miller, Fargo, N.D., for The North Dakota Public Service Comm., et al.

Martin W. Bercovici, Lawrence P. Halprin, Washington, D.C., for The Committee on Transp. and Distribution of the Society of Plastic Ind., Inc.

Dennis N. Barnes, Washington, D.C., for Electric Fuels Corp.

Frederick W. Claybrook, Jr., Herbert J. Martin, Karen Shoos Lipton, Washington, D.C., for American Iron and Steel Institute.

David A. Sutherlund, Washington, D.C., for Coastal States Energy Co. and National Ass'n of Mfrs.

Frederick P. Furth, Bruce J. Wecker, San Francisco, Cal., for Kellogg Co.

John J. Powers, III, James H. Laskey, Kenneth P. Kolson, Antitrust Div., U.S. Dept. of Justice, Timm L. Abendroth, Henri F. Rush, ICC, Washington, D.C., for U.S.A. and ICC.

Michael Boudin, Washington, D.C., Walter J. Suthon, III, New Orleans, La., James R. Atwood, Washington, D.C., for The Ass'n of American Railroads.

Before CLARK, Chief Judge, BROWN, RUBIN, REAVLEY, POLITZ, TATE, JOHNSON, WILLIAMS, JOLLY and HIGGINBOTHAM, Circuit Judges *.

JOHNSON, Circuit Judge:

Prior to 1976, the Interstate Commerce Commission (ICC) had unfettered authority to review all railroad rates under the "just and reasonable" standard promulgated by Congress.[1]  Then, through enactment of the

---

* Judges Thomas Gibbs Gee, Carolyn Dineen Randall, and Will Garwood recused themselves and did not participate in the decision.

1. Former section 1(5) of the Interstate Commerce Act provided that "[a]ll charges made for any service rendered or to be rendered . . . shall be just and reasonable and every unjust and unreasonable charge . . . is prohibited and declared unlawful."  The issues in this case are reflected in the revised language of the recodification and amended Act which now qualifies the reasonableness requirement: "If the Commission determines . . . that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier must be reasonable, 49 U.S.C. 10701a(b)."

Railroad Revitalization and Regulatory Reform Act of 1976 (the 4R Act),[2] Congress sought to reduce regulatory restraints on railroad pricing decisions.[3] Under the 4R Act, the ICC now has jurisdiction to review a rate only if it determines that the carrier can exclude effective competition to the extent that the carrier has "market dominance," defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies."

Whether the ICC, in administering the "market dominance"[4] standard, may consider evidence of product and geographic competition is the issue before the *en banc* Court.[5] A divided panel of this Court concluded that the 4R Act "limits the definition of market dominance to transportation of the same product from the same origin to the same destination." *See Western Coal Traffic League v. United States,* 694 F.2d 378, 382 (5th Cir.1982), *reh'g en banc granted,* Order of March 7, 1983. Since we conclude that such a result fails to afford the ICC the deference due under existing law and places undue emphasis upon certain terms contained in the 4R Act, we affirm the ICC's orders allowing consideration of product and geographic competition. We also affirm the ICC's guidelines as in conformance with the congressional directive to the ICC to establish standards and procedures to be utilized in making the market dominance determination.

**2.** Pub.L. No. 94–210, 90 Stat. 31 (1976), to be incorporated into the U.S.Code as part of the Revised Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.*

**3.** *See* § 101 of the 4R Act.

**4.** Market dominance was defined originally as "an absence of effective competition from other carriers or modes of transportation for the traffic or movement to which a rate applies." Pub.L. No. 94–210, § 202(b), 90 Stat. 31 (1976), codified at 49 U.S.C. § 1(5)(c) (1976). That language was revised and re-enacted without substantive change when the Interstate Commerce Act was recodified in 1978.

**5.** Product competition refers to competition generated as a result of the availability of substitute products. For example, if a power plant

## I. *Background and Procedural History*[6]

Throughout the nineteenth century, railroads constituted the dominant mode of transportation in the United States. Unaffected by any meaningful competition, the railroads were able to set rates that often proved to be unjust and unreasonable. As Justice Fortas noted in *American Truck Associations v. Atchison, T. & S.F. Railroad Co.,* 387 U.S. 397, 87 S.Ct. 1608, 1613, 18 L.Ed.2d 847 (1967): "In this country, the railroads had a practical monopoly of freight transportation, and secret rebates, special rates to favorite shippers, and discriminations flourished." Hence, in 1887, the Interstate Commerce Act was enacted and virtually all interstate railroad rates became subject to exacting scrutiny under the just and reasonable standard set forth in the Interstate Commerce Act. 49 U.S.C. § 1(5) (1976).

By 1976, however, many of the justifications for extensive regulation of railroad rates no longer existed. The premise of railroad dominance had become outdated and, as the ICC found as early as 1971, "there are few significant commodities which are not practically susceptible to transportation by at least two competing modes of surface transportation." *Illinois Central Gulf Railroad-Acquisition G., M. & O, et al.,* 338 I.C.C. 805, 836 (1971). Additionally, as was noted by Congress in enacting the 4R Act, significant financial losses were being incurred by the railroads and extensive, industry-wide regulation was no

in Texas generally operated on coal transported by rail from a mine in Wyoming but also could operate on natural gas from a field in Wyoming, the indirect competition from the natural gas industry would constitute "product competition." Geographic competition refers to transportation of the same product from a different location. For example, if the Texas power plant could obtain coal from a source other than the mine in Wyoming (*i.e.,* Pennsylvania), the indirect competition from the Pennsylvania mine would constitute geographic competition.

**6.** For an exhaustive treatment of the history of the 4R Act *see Western Coal Traffic League v. United States,* 694 F.2d at 384–90.

longer justified. Sen.Rep. No. 499, 94 Cong.2d Sess. 2–3, reprinted at 1976 U.S. Code Cong. & Ad.News 14, 15–17. Nevertheless, recognizing that certain carriers still were unrestrained by effective competition, Congress refused to completely deregulate the railroad industry.

■ The 4R Act evidences Congress' intent to deregulate the railroad industry only in the areas in which effective competition exists. Today, in order for the ICC to intercede in ratemaking practices, it must make an initial, jurisdictional determination that the carrier has market dominance. The 4R Act defines market dominance as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10701a(b)(1) (Supp. IV 1980). Significantly, however, Congress empowered the ICC to adopt "standards and procedures" for determining whether a railroad possessed market dominance.[7]

Soon after the enactment of the 4R Act, the ICC embarked upon its attempt to provide standards and procedures to determine the market dominance issue. The ICC's first attempt at establishing such standards and procedures occurred in *Ex Parte No. 320. See Ex Parte No. 320,* Spec.Proc. for Findings of Market Dominance, 353 I.C.C. 873, *modified,* 355 I.C.C. 12 (1976).[8] One of the many issues presented involved the role of product and geographic competition in determining whether a carrier possessed market dominance. Although the Department of Justice, Department of Transportation, and the railroad industry urged the ICC to consider evidence of product and geographic competition, the ICC determined that such evidence would not be con-

sidered. Two reasons for this initial conclusion were advanced by the ICC. First, the ICC concluded that such evidence would create complex antitrust-type litigation and, second, the ICC felt that the statutory definition of market dominance precluded consideration of such competition. *See Ex Parte No. 320,* 353 I.C.C. at 904–05.

The regulations initially advanced by the ICC in *Ex Parte No. 320* underwent judicial attack in *Atchison, T. & S.F. Railroad v. ICC,* 580 F.2d 623 (D.C.Cir.1978). As in the case *sub judice,* a major issue before the D.C. Circuit involved the ICC's refusal to consider geographic and product competition. Although the D.C. Circuit ultimately upheld the ICC's regulations, finding "sufficient basis in the statutory language and purpose to merit our deferral to the Commission's view," *id.* at 634, the court noted that the ICC's construction "may appear to some as an attempt to attribute excessive significance to a terse statutory clause." *Id.* In concluding, the D.C. Circuit emphasized that its role was one "of deference and deferral" and noted that "[t]he Commission will be in a position to evaluate the regulation more fully in light of experience." *Id.*

After several years of experience with the regulations promulgated in *Ex Parte No. 320* and after completion of several studies,[9] the ICC proposed removal of many of the cost presumptions outlined in *Ex Parte No. 320* and proposed that litigants present any relevant evidence on the issue of market dominance, specifically including evidence of geographic and product competition. *See Ex Parte No. 320 (Sub–No. 1) Rail Market Dominance and Related Con-*

---

**7.** The pertinent statutory language, set forth in the 4R Act, § 202(b), codified at 49 U.S.C. § 1(5)(d) (1976), repealed by Pub.L. No. 95–473, § 4(b), (c), 92 Stat. 1337, 1466–70 (1978), was:

Within 240 days after the date of the enactment of this subdivision, the Commission shall establish, by rule, standards and procedures for determining in accordance with Section 15(9) of this part, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a par-

ticular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay.

**8.** *See Western Coal Traffic League v. United States,* 694 F.2d at 385–86 for further explication of the provisions set forth in *Ex Parte No. 320.*

**9.** *See Western Coal Traffic League v. United States,* 694 F.2d at 386 n. 33 and material cited therein.

*siderations,* 45 Fed.Reg. 3353 (proposed January 17, 1980). While the ICC was considering comments on its proposed decision, however, Congress enacted new legislation.

In an effort to hasten railroad rate deregulation, Congress, in 1980, enacted a second major deregulation statute, the Staggers Act. Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, codified in various sections of 49 U.S.C. § 10101, *et seq.* By a new provision contained in the Staggers Act, 49 U.S.C. § 10709(d), Congress required the ICC to deregulate a rail rate insofar as the carrier's rate of return falls below a specified percentage of the costs incurred by the carrier in providing the service. Additionally, even if the rail rate is above that percentage, the ICC still must determine whether market dominance exists. 49 U.S.C. § 10709(a), (b). Although Congress did revamp the ICC's regulations in these respects, it did not alter the market dominance statute enacted in the 4R Act and, in fact, emphasized that it did not intend "in any way to restrict the ability of the Commission to apply [the market dominance] concept, both in its regulations and individual cases." H.Rep. No. 96–1430, 96th Cong., 2d Sess. 89 (1980), U.S.Code Cong. & Admin.News 1980, p. 3978, 4120. Also, it is important to note that Congress was aware of the ICC's stated intent to consider product and geographic competition when the Staggers Act was debated. *See* 359 I.C.C. at 736–37.

Finally, following enactment of the Staggers Act, the ICC instituted *Ex Parte No. 320 (Sub. No. 2),* the proceeding that gave rise to this case, to consider changes in its market dominance rules. As noted previously, the ICC reaffirmed its decision to consider evidence of product and geographic competition in making the market dominance determination. On review in this Court, the petitioners attacked the ICC's new rules on a variety of grounds, including a claim that product and geographic competition was inadmissible under the express terms of the 4R Act. A divided panel of this Court held that the ICC lacked statutory authority to consider evidence of product and geographic competition. Thereafter, this Court granted rehearing *en banc* and the case was orally argued before the *en banc* Court on June 7, 1983.

## II. *Product and Geographic Competition*

The petitioners challenge the validity of the ICC's regulations allowing consideration of product and geographic competition. They contend that the regulations exceed the ICC's statutory authority.

We begin, as we must, with a recognition of the limited role this Court plays in reviewing an administrative agency's construction of its statutory authority and the regulations promulgated pursuant thereto. Far removed from the practical realities of the day-to-day regulation of this nation's railroads, we must defer to the agency's interpretation of the statute and affirm that interpretation if "it has a reasonable basis in law." *See Aberdeen & Rockfish Railroad Co. v. United States,* 682 F.2d 1092, 1096 (5th Cir.1982), *quoting Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). That the members of this Court might have construed the statute differently is inconsequential. *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). Moreover, when an agency, pursuant to congressional mandate, has adopted regulations designed to effectuate its statutory duties, this Court will not set aside such regulations unless the agency has exceeded its statutory authority or if its regulations so far depart from the statutory authorization that they can be interpreted as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Batterton v. Francis,* 97 S.Ct. at 2405–06.

■ As we have seen, the 4R Act clearly evinces Congress' intent to deregulate the railroad industry only in areas in which effective competition exists. In both the 4R Act and the Staggers Act, Congress stressed its conviction that competitive forces, rather than regulations should be used to set price and service levels where effective competition prevails. Nonethe-

less, Congress clearly intended to retain the protections of ICC rate regulation in areas in which no effective competition prevails. In determining whether the ICC's decision to consider product and geographic competition exceeds its statutory authority, we must recognize Congress' stated policy of deregulating rail rates only in areas in which effective competition exists. "[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object or policy." [10] *See Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

The 4R Act does not contain a detailed congressional formula for determining market dominance. Instead, it contains a generally phrased test designed to achieve a stated goal—deregulation of rail rates subject to effective competition. Congress not only expected but required the ICC to undertake the task of developing "standards and procedures" for determining "whether and when a [railroad] possesses market dominance." Quite clearly, the ICC was given broad statutory authority to prescribe standards and procedures to be utilized in facilitating railroad rate deregula-

tion. Well-established precedent requires us to uphold the ICC's regulations unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The regulations adopted by the ICC in *Ex Parte No. 320 (Sub. No. 2)* cannot be considered arbitrary, capricious, an abuse of discretion, or inconsistent with law. Adopted pursuant to congressional mandate, the regulations reflect considered judgment in light of practical experience. Although the ICC's decision to consider product and geographic competition depart from prior ICC decisions, none can doubt the ICC's authority to change its mind in light of experience. *American Truck Associations v. Atchison T. & S.F. Railroad Co.,* 87 S.Ct. at 1613 (1967). Certainly, regulatory agencies "are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *Id.*

The ICC advanced the following reasons in support of its decision to consider product and geographic competition in making the market dominance determination.

We believe that [our prior] interpretation was unnecessarily restrictive. There is

---

**10.** As we have seen, a divided panel of this Court held that the 4R Act's definition of market dominance precluded consideration of indirect competition (*i.e.,* product and geographic competition) since the definition "refers to 'effective competition ... *for* the transportation to which a rate applies,' not to competition *with* that transportation." *Western Coal Traffic League v. United States,* 694 F.2d at 390. Although the panel majority conceded that indirect competition could be as effective as direct competition and that consideration of indirect competition would increase the number of rates immunized from regulation, *id.* at 382, it nonetheless concluded that Congress' choice of the preposition "for" instead of "with" demonstrated congressional intent to preclude consideration of indirect competition. We are hesitant to rely heavily upon a vague congressional use of prepositions in determining the extent of the ICC's jurisdiction to review rail rates.

As the panel majority conceded, to preclude the ICC's consideration of indirect competition will increase the number of rates subject to ICC regulation. Such a result clearly is inconsistent with Congress' repeated attempts to deregulate the railroad industry. Congress stressed the need for deregulation in enacting

the 4R Act and re-emphasized that need in enacting the Staggers Act. In light of this congressional intent to deregulate all rates subject to effective competition, we are most hesitant to resolve the market dominance issue on the basis of a prepositional controversy. As the Supreme Court has repeatedly held, "the width of administrative authority must be measured in part by the purposes for which it was conferred." *Permian Basin Area Rate Cases,* 390 U.S. 747, 776, 88 S.Ct. 1344, 1364, 20 L.Ed.2d 312 (1967). The ICC's administrative authority undoubtedly was created in an attempt to deregulate all rates subject to effective competition. We should not interpret the 4R Act in a manner inconsistent with that purpose. Moreover, even if the plain terms of the 4R Act suggest such a result, we must heed the Supreme Court's directive that "even when the plain meaning [does] not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole'" the Court should follow that policy instead of the literal words. *See United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1970), *quoting Ozawa v. United States,* 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199 (1922).

no evidence in the 4R Act that we consider only "direct" competition from other carriers or modes. Since the traffic to which the rate applies faces competition from other sources or destinations of the same product or from substitute products the carriers transporting that traffic face "indirect" competition from other carriers .... "[E]ffective competition from other carriers or modes of transportation, for the traffic to which the rate applies" means that, if a carrier raises the rate for such traffic, then some or all of that traffic will be lost to other carriers or modes.

Additionally, the ICC responded to the contention that its new regulations were unmanageable by stating:

> In general, geographic or product competition will be deemed to be present if it is established that alternative supplies of the same or a close substitute product exist and that carriers transporting these same or close substitute commodities from the various sources to the various destinations compete with one another for the traffic in question. Whether such competition is judged to be effective will depend on evidence concerning the substitutability of one supply source or destination for another or one product for another. If, in a particular case, the Commission finds that the evidence submitted is inconclusive, then such evidence will be given minimal weight in our determination of market dominance. We believe that this is an improvement over our 1976 position that evidence of geographic and product competition be always and automatically excluded from every proceeding.

365 I.C.C. at 130.

Indeed, nothing in the 4R Act evinces congressional intent to preclude consideration of indirect competition. As we have seen, Congress simply sought deregulation of rail rates subject to effective competition. Refusing to set forth a rigid standard for determining when effective competition exists, Congress authorized the ICC to establish appropriate standards and proce-dures for determining when market forces suffice to regulate rail rates. The ICC is in the best position to determine whether product and geographic competition play a role in the day-to-day fluctuations in rail rates and whether consideration of such evidence is feasible within the requirements of the 4R Act. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Nothing in the 4R Act requires the ICC to make its decisions in a regulatory vacuum ignoring the practical effects of indirect competition. Undoubtedly, if the ICC was required to ignore the effects of indirect competition, certain rates would become subject to regulatory intervention even though the rate is governed by market forces. Such a result flies in the face of Congress' stated policy of deregulation of rates subject to effective market control. As the Final Conference Report to the Staggers Act emphasized, "*Whenever* there is effective competition, such competition should continue to function as the regulator of the rate rather than the Commission." Hence, we cannot conclude that the ICC exceeded its statutory authority by adopting regulations that will allow it to consider the effects of indirect competition on rail rates in determining whether market dominance exists under the 4R Act. The ICC's interpretation of the 4R Act, when viewed with the deferential attitude required under existing precedent, certainly has a reasonable basis in law. *See Aberdeen & Rockfish Railroad Co. v. United States,* 682 F.2d at 1096.

We also note that we find nothing inconsistent with this result in the Staggers Act. Indeed, the Staggers Act reflects a reinforced congressional intent to allow the ICC to continue to promulgate standards and procedures for making the market dominance determination. The Conference Commission Report specifically stated that Congress' action was "not intended in any way to restrict the ability of the Commission to apply this concept, both in its regulations and individual cases." H.Rep. No. 96–1430, 96th Cong.2d Sess. 88–89 (1980), U.S.Code Cong. & Ad.News 1980, 4120.

This is particularly significant, since Congress was aware of the ICC's stated intent to consider product and geographic competition when the Staggers Act was debated. *See* I.C.C. at 736–77.

### III. *The ICC's Market Dominance Guidelines*

■ The petitioners contend that the ICC's guidelines are at variance with the congressional directive to the ICC in the 4R Act to "establish, by rule, standards and procedures for determining ... whether and when a carrier possesses market dominance .... Such rules shall be designed to provide a practical determination without administrative delay." Section 202(b). The panel majority held that the ICC's guidelines conform to the 4R Act's "rule" requirement, but declined to address petitioners' argument that the guidelines lacked the definiteness and predictability of standards and, hence, do not allow the ICC and parties to measure in a practical way whether there is effective competition in a particular situation. *Western Coal Traffic League v. United States,* 694 F.2d at 392. We have reviewed the ICC's guidelines and hold that they satisfy the congressional directive.

The ICC's guidelines do not, of course, enable a party to predict in each case whether market dominance exists. But, the object of the "standard" requirement in the 4R Act was not to establish hard and fast rules for every situation; the myriad individual circumstances in the complex world of rail transportation make that an impossibility. The guidelines do, however, provide a detailed guide as to what the ICC considers relevant, the placement of the burden of proof, and how to present a case to the ICC. We must remain cognizant of the Supreme Court's direction "that the formulation of procedures [is] basically to be left within the discretion of the agencies to which Congress [has] confided the responsibility of substantive judgments." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel, Inc.,* 98 S.Ct. at 1202. Only experience will demonstrate the ability of the ICC to manage its new guidelines. As the D.C. Circuit noted in *Atchison, T. & S.F. Railroad v. ICC,* 580 F.2d at 640, "the courts remain open if the Commission is slothful or unwilling to undertake appropriate reconsideration and fine tuning in the light of experience." At this time, we cannot say that the ICC has failed to fulfill the congressional directive. Hence, we affirm the ICC's guidelines.

### IV. *Conclusion*

For the foregoing reasons we affirm the ICC's decision to consider evidence of geographic and product competition. We also affirm the ICC's guidelines since they fulfill the congressional directive to establish standards and procedures for making the market dominance determination.

The original panel of this Court was presented with several issues that are not at issue before the *en banc* Court. *See Western Coal Traffic League v. United States,* 694 F.2d at 385–89, part III, sections 1, 2, 3, and 4. Judge Brown dissented only with regard to the majority's decision on product and geographic competition (part II, section 5). This *en banc* opinion overturns the original panel's opinion with respect to its decision on product and geographic competition (part III, section 5). In all other respects (part III, sections 1, 2, 3, and 4), the panel's decision is adopted as the opinion of the *en banc* Court. Hence, all of the objections to the ICC's decision in *Ex Parte No. 320 (Sub. No. 2)* are rejected and the ICC's decision is AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, with whom REAVLEY, Circuit Judge, joins, dissenting.

The words of the 4–R statute are refreshingly simple and direct: market dominance exists when there is "an absence of effective competition *from other carriers or modes of transportation for the traffic or movement to which a rate applies*" (emphasis added). 49 U.S.C. § 10709(a) (Supp. IV 1980).[1] Congress gave the Commission no

---

1. The Staggers Act, passed in 1980, changed    the wording of this definition, but, as the ma-

power to reinterpret these plain words but only the authority for 240 days to adopt "standards and procedures" for determining "whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates." 49 U.S.C. § 1(5)(d) (1976).

Competition *for* a movement of coal by rail from a coal mine in Kentucky to a public utility in the City of Austin, Texas, exists only if some other carrier is willing to move that coal from Kentucky to Austin. That is competition for the "service rendered or to be rendered." That another railroad is able to move coal from a strip mine in Wyoming to Austin creates competition *with* the Kentucky-Texas movement but not competition *for* that movement. The Wyoming-Texas carrier is not offering the same service. Even more obviously, the offer by a pipeline to supply an alternate energy source, natural gas, provides economic competition *with* the Kentucky-Texas movement but it is not competition *for* that movement. Such products have different physical properties and must be transported in a different manner. The Wyoming-Texas natural gas carrier is, therefore, not offering the same service. It is not competing for the transportation to which the market-dominant rate applies.

In neither case is there competition from other carriers or modes of transportation for the traffic or movement to which the challenged rate applies. That is the type of competition that the statute specifies, not competition from other products or from other geographic areas.

The majority opinion states that the panel opinion relied "heavily on a vague congressional use of prepositions." *Ante,* p. 778 at n. 10. The use of the preposition in the statute is not vague, but, in any event, it is not the sole basis for reading the statute as being limited to direct carrier competition.

"The 4R act speaks of 'the traffic or movement to which the rate applies'" an authority eminent in defining terms used in interstate commerce has said. "When used in this context in the transportation industry, the word 'movement' refers to transportation *from a single origin point to a single destination point, while the word 'traffic' commonly denotes transportation services from a named set of points to another point or set of points;* from specific areas to rate groups or in blanket areas; or between stated mileage brackets on particular commodities in a given territory. *There is no language in the legislation which would warrant the extension of the phrase the traffic or movement to which the rate applies, beyond transportation services which are comparable to that described in the issue tarriff.*" [2]

The definition of the meaning the industry attributes to the words in the statute was not by some professed pundit but by the Commission itself, which surely should, after a century of experience, be conversant with the industrial lexicon. The definition of these terms in the industry has not, I take it, changed since 1976. It was this clarity of language that led the Commission to say in 1976 that the market definition in the statute was "explicit." [3]

Four years later the definition that was once "explicit" is no longer exact. It has instead acquired "a range of possible interpretations which Congress left to the Commission to fix exactly." [4] Even if it were permissible to adjust the interpretation somewhat, the same statute cannot either in good conscience or good English be read to say that what is black one day is white the next, that what is day one day is night the next, that what *must* be excluded one

---

jority opinion concedes, effected no substantive change in it. 49 U.S.C.A. § 10709(a) (West Special Pamphlet 1983) ("an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies"). *See ante,* at 777.

**2.** Ex Parte No. 320 (Sub-No. 1), 353 ICC at 904–905 (emphasis added).

**3.** *Id.* at 905.

**4.** Ex Parte No. 320 (Sub-No. 2), 365 ICC at 129.

day must be permitted the next—or even five years later.

The congressional history does not indicate that the Commission was meant to consider geographic and product competition in determining whether a carrier has market dominance. The Senate Conference Report on the 4R Act merely states:

> The Department of Justice had, however, suggested only the consideration of such evidence in rebuttal. *Id.,* at 633.

> While the absence of effective competition test is not intended to strictly conform with the standards of the antitrust laws, it is intended that when the Commission administers the test *it will recognize the absence of forces which normally govern competitive markets.*" (Emphasis added.)

1976 U.S.Code Cong. & Ad.News 148, 163. Far from requiring the Commission to recognize the *presence* of product-geographic competition, this language mandates only that the Commission recognize the *absence* of competitive forces in the railroad industry.

The Staggers Act demonstrates that Congress knew the economic significance of product-geographic competition and referred specifically to those factors when it thought them appropriate. Section 205(a)(1) of the act requires the Commission to initiate a proceeding to determine whether, and to what extent, "product competition" (defined by the statute to include both what we have called product and geographic competition) should be considered in determining the reasonableness of rates. The instruction is not set forth in the U.S.Code but is contained in the historical note following 49 U.S.C.A. § 10701a (West Special

Pamphlet 1983). Section 205(a) expressly recites that this directive shall not be construed as altering the "meaning, use, or interpretation by the Commission, the courts, or any party of the term 'market dominance' . . . . The enactment of [Section 205] shall not be considered by the Commission in any proceeding, or by any court on an appeal from that or any other proceeding, to determine the proper scope of the term 'market dominance . . . .'" Pub.L. No. 96–448, § 205(a)(3)(B), 94 Stat. 1906 (1980).[5]

The Commission's interpretation of the statute would read "effective competition . . . *for* the transportation to which a rate applies" to mean "effective competition *with* the transportation." This disregards the words requiring competition "from other carriers or modes of transportation."[6] Indeed, it gives the statute only the meaning carried by the phrase "absence of effective competition" without any limitation whatever. There may be sound economic or administrative arguments for giving the Commission such free rein, but Congress simply did not do so. The Commission's studies showing that direct competition for a particular movement is not a sufficient economic test may indicate how much wiser Congress would have been had it allowed the Commission more latitude. Those studies and the Commission's recommendations may, indeed, persuade Congress to alter the statute. But the post-enactment economic studies tell us nothing about what the statute means.

In this part of the 4R Act, Congress did what courts have repeatedly criticized it for failing to do.[7] It wrote clearly and suc-

---

5. On May 14, 1981, the Commission issued a decision concluding that such competition would not be considered as a reasonableness issue. Ex Parte No. 320 (Sub-No. 2), Market Dominance Determinations, 365 I.C.C. 1 (1981), *petition for review filed sub nom. Association of American Railroads v. United States,* No. 81–2249 (D.C.Cir., filed Nov. 30, 1981), *transferred,* No. 82–4082 (5th Cir. Feb. 26, 1982), consolidated with No. 81–4257, *motion to sever granted,* June 17, 1982.

6. 49 U.S.C.A. § 10709(a) (West Special Pamphlet 1983). The Commission's interpretation would also ignore the clear implication of § 10709(b), directing the commission to determine whether the carrier proposing a challenged rate has market dominance "over the transportation to which the rate applies."

7. *See, e.g., Regional Rail Reorg. Act Cases,* 419 U.S. 102, 133, 95 S.Ct. 335, 353, 42 L.Ed.2d 320, 347 (1974); *Pillsbury v. United Engineering Co.,* 342 U.S. 197, 200, 72 S.Ct. 223, 225, 96 L.Ed. 225, 229 (1952); *United States v. Evans,*

cinctly. Indeed, the entire definition of market dominance is set forth in twenty words. Its brevity implies no ambiguity. When a statute is clear, it must be read to mean what it says. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 67, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748, 755 (1982); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246, 252 (1981); *Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171, 180 (1981).

Administrative agencies are given latitude in interpreting statutes they execute.[8] When the statute requires interpretation, we defer to their expertise and responsibility.[9] But when statutory words are plain, there is no reason to defer, for our competence and experience in statutory interpretation are surely greater. "[T]he courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute ... that are inconsistent with the statutory mandate ..." *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 42, 70 L.Ed.2d 23, 33 (1981).

Our colleagues in the majority straddle the issue of interpretation. They do not read the statute either to require or to forbid the consideration of geographic competition. They simply defer to the Commission's decision. This might be appropriate were the statute unclear. But deference has already been paid to the Commission's 1976 reading of the statute to mean that the statute forbids such consideration. No court, including the majority, has found this interpretation to be in error. It is, I submit, not only permitted but compelled.

What the Interstate Commerce Commission has done is to perform a sleight-of-hand interpretation. It decided in 1981 that a statute permits it to consider evidence that, in a careful 1976 decision, it had read the self-same statute to preclude. The

statute has not been amended. Nothing new has been discovered in its legislative history, and, despite the majority's effort to find some hint of later congressional sanction in the Staggers Act, the Commission itself has, after relying on that history, said that the Staggers Act contains nothing that directly supports the change. What the Commission has said is simply that it has changed its mind: its earlier "interpretation was unnecessarily restrictive."[10] "[T]he thoroughness, validity, and consistency of an agency's reasoning are factors that bear on the amount of deference to be given the agency's ruling." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23, 33 (1981). The Commission has been neither thorough nor consistent here. *See General Electric Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 411, 50 L.Ed.2d 343, 357 (1976) ("We have declined to follow administrative guidelines in the past where they conflicted with earlier pronouncements of the agency"); *United Housing Foundation, Inc. v. Foreman,* 421 U.S. 837, 857–859, 95 S.Ct. 2051, 2063–64, 44 L.Ed.2d 621, 635–36 (1975); *Fort Worth & Denver Ry. Co. v. Lewis,* 693 F.2d 432 (5th Cir.1982) (adhering to agency's "original and contemporaneous construction" of the Act in question). Only a few weeks ago, we denied deference to an agency decision because the agency had, "in the guise of interpretation," effected "a change in statutory intent." *Quarles v. St. Clair,* 711 F.2d 691 (5th Cir.1983).

After adopting a practice and using it in actual operation, an administrative agency may properly change its course and decide that the practice is not feasible. Experience, the old saw correctly runs, is the best teacher. For this reason, we defer to agency judgments based on experience. In this case, I would defer to a decision that the

---

333 U.S. 483, 484–85, 68 S.Ct. 634, 635, 92 L.Ed. 823, 825 (1952); *United States v. Mason,* 611 F.2d 49, 52 (4th Cir.1979); *Zeigler Coal Co. v. Kleppe,* 536 F.2d 398, 406 (D.C.Cir.1976).

**8.** *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448, 456 (1977);

*Williams v. St. Clair,* 610 F.2d 1244, 1249 (5th Cir.1980).

**9.** *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965).

**10.** Ex Parte 320 (Sub-No. 2), 365 ICC 128.

consideration of indirect competitive factors would not, as earlier thought by the Commission, unduly protract proceedings.[11] This is something that can be learned by experience. But the Commission has no greater experience in interpreting the statute now than it had in 1976. Indeed, it has had no experience with considering geographic or product competition as a factor in determining market dominance.

There is a "judicial—indeed, universally human—temptation to pass responsibility on to others by saying one is *describing* their will when one is, in truth, *prescribing* what is to be." [12] The Commission has attributed what it wills to a Congress that never intended this result. The hand is masked as the hand of Congress but the voice that speaks is in truth the voice of the Commission.

Congress knows exactly how to deregulate an industry when it chooses to do so. It has effectively deregulated rate control of air transportation.[13] In adopting the 4R Act, it did not intend to eliminate the regulation of maximum railroad rates but only to lessen regulation when "competition is actually sufficient to insure that rates will not exceed a reasonable level." Its aim was, as the majority agrees, to deregulate rates only in the areas in which effective competition exists. But Congress defined what it meant by effective competition: it is competition from other carriers for the traffic or movement to which a rate applies. Our guide most unerring is neither legislative history, a history that is uncertain, nor the definition of effective competition revised by a Commission bent now on its own goal, heedless both of congressional intent and of cost to shipper or consumer, but what Congress itself said.[14]

An agency that changes its course by rescinding a rule and adopting a contrary one "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* —— U.S. ——, ——, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443, 457 (1983). "[T]he forces of change do not always or necessarily point in the direction of deregulation." *Id.* The Commission has not explained or even attempted to explain why what was "explicit" in 1976 is no longer so, why what was an industry meaning five years before has suddenly changed, or why it has learned better how to read a statute in the interim. Even if it had discretion initially to interpret the statute, it has not "cogently explain[ed] why it has exercised its discretion in a given manner." (citations omitted). *Id.* at ——, 103 U.S. at 2869, 77 L.Ed.2d at 461. This failure ought to suffice for rejection of its change of heart. 4958.

For these reasons, I respectfully dissent from our abdication of our duty to interpret the laws of the United States and from the majority's acceptance of a meaning that the statute cannot bear.

---

**11.** Ex Parte 320 (Sub-No. 1), 353 ICC at 905.

**12.** Tribe, Toward a Syntax of the Unsaid: Construing the Sounds of Congressional and Constitutional Silence, 57 Indiana L.J. 515, 523 (1982) (emphasis in original).

**13.** The Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705 (1978), Pub.L. No.

96-192, § 28, 94 Stat. 48 (1980) (codified in scattered sections of 49 U.S.C.).

**14.** *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633, 638 (1981); *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 187, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117, 141 (1978).