761 F.2d 746
 245 U.S.App.D.C. 343
 ALUMINUM COMPANY OF AMERICA, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Akron, Canton & Youngstown Railroad Co., et al., Intervenors.
The ALUMINUM ASSOCIATION, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Akron, Canton & Youngstown Railroad Co., et al., Intervenors.
REYNOLDS METALS COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Akron, Canton & Youngstown Railroad Co., et al., Intervenors.
 Nos. 83-1730 to 83-1732.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 16, 1984.
Decided May 10, 1985.
 
 Barry Roberts, Washington, D.C., with whom Dickson R. Loos, Washington, D.C., was on brief, for petitioners. David H. Baker, Washington, D.C., also entered an appearance for petitioners.
 Cecelia E. Higgins, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, I.C.C., John J. Powers, III and George Edelstein, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.
 William R. Power, Chicago, Ill., for intervenors.
 Before EDWARDS and SCALIA, Circuit Judges, and SWYGERT,* Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit.
 Opinion for the Court filed by Circuit Judge SCALIA.
 SCALIA, Circuit Judge.
 
 
 1
 This case involves the Interstate Commerce Commission's dismissal of a shippers' complaint against certain rail rates, without considering whether the rates were just and reasonable, on grounds that the shippers had failed to establish the carriers' market dominance over the transportation in question. Two shippers, The Aluminum Company of America and Reynolds Metals Co., and the Aluminum Association, a trade association with member shippers, appeal the decision as procedurally defective and as arbitrary or capricious in its substantive result. The principal issue presented is application of the Commission's market dominance guidelines relating to so-called product competition, that is, competition from other carriers with regard to products that can readily be substituted for the products to which the challenged rates apply.
 
 
 2
 * Petitioners complained to the ICC in June 1980 about certain rates applicable to aluminum ingot moving from smelters in the states of Washington, Oregon, California, Arizona and Montana to fabrication facilities in the Midwest, East and South. Although the rates apply equally to ingots of virgin and recycled aluminum, the traffic at issue consists of virgin aluminum. Shortly after petitioners filed their complaint, there took effect the Staggers Rail Act of 1980, 94 Stat. 1895 (1980) (codified at scattered sections of Title 49 U.S.C. (1982)), which provided, with exceptions not relevant here, that rates in effect on the effective date of the act and not challenged within 180 days (or challenged and upheld) are thereafter permanently deemed lawful and not subject to challenge before the Commission or in any court. 94 Stat. 1934 (1980) (reprinted in 49 U.S.C. Sec. 10701a note).[1] Petitioners therefore amended their complaint in March 1981 to challenge all rates applicable to movements of aluminum ingot from Mountain Pacific Territory to transcontinental destinations in the Midwest, the East and the South.
 
 
 3
 On August 5, 1981, the Commission served the Administrative Law Judge's decision, which found that the railroads had market dominance over the aluminum ingot traffic and that their rates were unreasonably high. The railroads filed an administrative appeal in September 1981. The Interstate Commerce Act requires that the Commission make a final determination on an appeal within 180 days, see 49 U.S.C. Sec. 10327(f)(2), with provision for an extension of 90 days, see 49 U.S.C. Sec. 10327(j); additional extensions can be obtained only through extraordinary procedures not invoked in this case, see 49 U.S.C. Sec. 10327(k). In December 1981, the Commission ordered a 90-day extension to June 14, 1982. On April 7, 1982, the Commission served an order reopening the case for receipt of additional evidence. After further delays and in light of the Commission's failure to reach a decision, petitioners sought and obtained from the United States District Court an order requiring the ICC to reach a final decision within sixty days from April 8, 1983, Aluminum Association, Inc. v. ICC, No. 82-3475 (D.D.C. Apr. 8, 1983) (Order). In compliance with that order, the Commission served on June 8, 1983 the decision challenged here, Aluminum Association, Inc. v. Akron, Canton & Youngstown R.R., 367 I.C.C. 475 (1983). Petitioners filed petitions for review in this court under 28 U.S.C. Sec. 2342 (1982).
 
 II
 
 4
 Petitioners raise a flurry of procedural issues, only four of which require any discussion. The principal procedural claim is that the ALJ's determination became a final decision of the Commission when the Commission failed to complete its review within the period mandated by 49 U.S.C. Sec. 10327(f)(2), (j). However, 49 U.S.C. Sec. 10327(f)(3) provides that "[r]eview of, or appeal from, an initial decision shall be conducted under section 557 of title 5," which in turn provides that "[w]hen the presiding employee makes an initial decision, that decision then becomes the decision of the agency without further proceedings unless there is an appeal to, or review on motion of, the agency within time provided by rule." 5 U.S.C. Sec. 557(b) (1982) (emphasis added). In this case it is undisputed that the carriers filed a timely appeal. Furthermore, 49 U.S.C. Sec. 10327(f)(2) provides that "[i]f an initial decision is reviewed, it shall be stayed pending final determination of the matter, and it is an action of the Commission only after the final determination is made." It follows from the structure of these provisions that the remedy for the Commission's failure to comply with the statutory deadlines is the remedy which petitioners sought and obtained in the District Court, an order directing the Commission to act--not the senseless remedy of cutting off the rights of a totally innocent appellant.
 
 
 5
 Petitioners also challenge the Commission's decision to reopen the case on April 7, 1982 under 49 U.S.C. Sec. 10327(g)(1)(A), which permits reopening only for material error, new evidence or substantially changed circumstances. Even had the Commission not reopened, however, it could have taken all the steps it took here under its powers to review the ALJ's decision, see 49 U.S.C. Sec. 10327(f). Thus, if it was error to reopen, the error was harmless. See 5 U.S.C. Sec. 706.
 
 
 6
 Petitioners further contend that the Commission erred in receiving new evidence pursuant to an order of April 28, 1983. They acknowledge that 49 U.S.C. Sec. 10327(f)(2) specifically provides that "[a]n initial decision may be reviewed on the record on which it is based or by a further hearing," but they assert that the Commission's failure to make a final determination within 180 days as required by 49 U.S.C. Sec. 10327(f)(2) somehow deprived the Commission of authority to conduct further hearings. They offer no support for this proposition, which we reject as unsupported by the text of the statute and unsound as a matter of policy.
 
 
 7
 Finally, petitioners assert that even if the Commission could accept new evidence, it violated the Administrative Procedure Act ("APA") by not submitting the new evidence to the ALJ for an initial determination. This argument is based upon the following APA provision:
 
 
 8
 When the agency did not preside at the reception of the evidence, the presiding employee ... shall initially decide the case unless the agency requires ... the entire record to be certified to it for decision.... When the agency makes the decision without having presided at the reception of the evidence, the presiding employee ... shall first recommend a decision....
 
 
 9
 5 U.S.C. Sec. 557(b). Petitioners claim that this requires a new initial decision by the ALJ in the present case because, although the agency did preside at the reception of the new evidence, it did not preside at the reception of the original evidence.[2] Such an interpretation of the APA would make the above-cited provision of the Interstate Commerce Act authorizing review "by a further hearing," 49 U.S.C. Sec. 10327(f)(2), entirely useless, since the transcript of that hearing would then have to be referred to the ALJ for a new initial decision. The legislative history of the APA makes it entirely clear (if reason alone does not suffice) that such a strange result was not intended. As the Attorney General described to Congress the operation of the provision here at issue:
 
 
 10
 Upon review the agency may restrict its decision to questions of law, or to the question of whether the findings are supported by substantial evidence or the weight of evidence, as the nature of the case may be. On the other hand, it may make entirely new findings either upon the record or upon new evidence which it takes.
 
 
 11
 92 CONG REC. A2984 (1946); Leg. Hist. at 412. The case relied upon by petitioners, Kerner v. Celebrezze, 340 F.2d 736 (2d Cir.), cert. denied, 382 U.S. 861, 86 S.Ct. 121, 15 L.Ed.2d 99 (1965), is inapposite since there, unlike here, the new evidence was received by the original presiding officer, rather than by the final decisionmaker. The corresponding situation in the context of the present case would be receipt of the new evidence by the ALJ (without a new opinion), followed by decision by the ICC. Moreover, Kerner emphasized that the purpose of the initial decision requirement is to obtain an evaluation of witness credibility, see 340 F.2d at 739-40--a purpose that could hardly be served by a renewed ALJ opinion here, both because the new evidence was received by the agency rather than the ALJ, and because it did not consist of live testimony.
 
 III
 
 12
 On the merits, petitioners challenge as arbitrary and capricious the ICC's conclusion that they had failed to show market dominance.[3] A finding of market dominance, defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies," 49 U.S.C. Sec. 10709(a), is a prerequisite to Commission preclusion of unreasonably high rates. See 49 U.S.C. Sec. 10701a(b)(1). In the absence of market dominance, railroads may charge any rate that is not unreasonably low or otherwise forbidden by a provision of Title 49. See 49 U.S.C. Sec. 10701a(a).
 
 
 13
 The transitional provision of the Staggers Act applicable to this proceeding, see text at n. 1, supra, placed the burden of proof on petitioners. See 94 Stat. 1934 (1980) (reprinted in 49 U.S.C. Sec. 10701a note). We must sustain the Commission, therefore, if we find that on the basis of the evidence before it the Commission could reasonably have concluded that petitioners failed to demonstrate the existence of market dominance. Moreover, since decisions concerning market dominance are peculiarly within the expertise of the Commission, our review of such decisions must be particularly deferential. Cf., e.g., New England Grain & Feed v. ICC, 598 F.2d 281, 285 (D.C.Cir.1979) (since impact of competition on rates "is not precisely quantifiable ... gauging the extent of this justification for rate variations is a task summoning application of the Commission's expertise").
 
 
 14
 The ICC's decision was based upon the guidelines it had established in its rulemaking proceeding entitled Market Dominance Determinations and Consideration of Product Competition, 365 I.C.C. 118 (1981). Those guidelines had originally been adopted (in substantially different form) pursuant to specific statutory directive that the Commission "establish, by rule, standards and procedures for determining ... whether and when a carrier possesses market dominance," and that such rules "be designed to provide for a practical determination without administrative delay."[4] The guidelines in their present form call for consideration of intramodal, intermodal, geographic, and product competition. The Commission relied upon each of those factors as an independent basis for finding that the railroads lacked market dominance over the transportation at issue here. Because we find that the Commission's decision on product competition was reasonable, we do not discuss the other three factors.
 
 
 15
 Product competition within the meaning of the Commission's guidelines exists when a receiver or shipper can substitute for the product covered by the rail rate at issue other products that would move over different lines.[5] The theory is that when such substitutes are available the railroad's pricing freedom is constrained, since an increase in rates will produce an increase in the delivered price of the product, causing the shipper or receiver to switch to the substitute product moving over other lines, and thus depriving the railroad of the traffic entirely. See 365 I.C.C. at 128-29. In these proceedings, the Commission considered product competition from recycled aluminum--most of which is produced in areas other than the Northwest and is consequently not subject to the rates challenged here--and from other materials such as plastics, glass and steel.
 
 
 16
 Recycled aluminum constitutes a large and growing share of the total supply of that metal, accounting for one fourth of the market in 1982. The Commission concluded that a substantial amount of recycled aluminum could be substituted for primary ingot produced at complaint origins. Petitioners did not deny that recycled aluminum has a large and growing share of the total market, but they pointed out that recycled aluminum can be used only for certain applications in which metalurgical qualities need not be carefully controlled and that in any case the total amount of recycled aluminum available is much less than would be needed to replace all primary aluminum ingot now produced in and shipped from the complaint origins. The Commission acknowledged these facts but nonetheless concluded that there is product competition from recycled aluminum because such competition does not depend on "all or even a majority of the traffic in issue [being] at competitive risk. Rather, only a portion must be at risk sufficient to constrain rail pricing." 367 I.C.C. at 485.
 
 
 17
 The Commission also found that aluminum faces competition from many other materials, particularly from plastics and steel, which compete vigorously in the container market. More than one fourth of all aluminum used in the United States goes into packaging and containers. In 1982, 52.2 billion aluminum food and beverage containers were produced, but they faced competition from 35.0 billion steel cans, 45.4 billion glass containers, and 14.5 billion plastic bottles. Petitioners again did not contest that for many uses other materials compete with aluminum, but they asserted that the record failed to show that this competition had any effect on the prices they must pay railroads for transporting aluminum ingots. This argument, however, is precluded by the guidelines, which read in part as follows:
 
 
 18
 [I]f the railroad seeks a finding of no market dominance based on product or geographic competition it must identify where it believes such competition exists. Once the railroad has made this identification, the shipper has the burden of proving that the product or geographic competition identified by the railroad is not effective.
 
 
 19
 365 I.C.C. at 132.
 
 
 20
 It is not possible for petitioners in this proceeding to challenge the validity of this provision. The time for direct review of the Commission's guidelines has long passed. See 28 U.S.C. Sec. 2344. We need not resolve here the apparent conflict in the expression of our cases on the question whether, in the course of an appeal from an agency decision applying a rule to a specific set of facts, we may entertain a challenge to the rule itself after the jurisdictional deadline for direct review of the rule has expired. See Network Project v. FCC, 511 F.2d 786, 789 n. 1 (D.C.Cir.1975) (rule may be challenged in such circumstances); Asphalt Roofing Manufacturers Association v. ICC, 567 F.2d 994, 1005 (D.C.Cir.1977) (rule may not be challenged in such circumstances); Investment Company Institute v. Board of Governors of the Federal Reserve System, 551 F.2d 1270, 1282 n. 13 (D.C.Cir.1977) (rule may be challenged in such circumstances only by a party with a valid excuse for failing to pursue direct attack). The Aluminum Association was a party to the Fifth Circuit suit that unsuccessfully challenged the guidelines, Western Coal Traffic League v. United States, 719 F.2d 772 (5th Cir.1983) (en banc). Reynolds and Alcoa are both members of the Aluminum Association. Both the Association and its members are precluded from relitigating that case here. See Western Coal Traffic League v. ICC, 735 F.2d 1408, 1411 (D.C.Cir.1984). We may note, moreover, that the issue of burden of proof regarding the product competition in a particular case was not merely a point that could have been raised in the direct challenge (though that alone would be enough); it was in fact considered and approved by the reviewing court:
 
 
 21
 The guidelines do ... provide a detailed guide as to what the ICC considers relevant, the placement of the burden of proof, and how to present a case to the ICC.... We ... affirm the ICC's guidelines....
 
 
 22
 Western Coal Traffic League, 719 F.2d at 780.
 
 
 23
 The short of the matter is that the railroads established what could reasonably be regarded as substantial product competition with virgin aluminum, and that the petitioners did not demonstrate that competition to be ineffective in restraining rail rates. Taking as a given the validity of the ICC's guidelines regarding product competition, we cannot possibly conclude that the ICC was unreasonable in declining to find that the petitioners had carried the burden of establishing market dominance.
 
 The petitions for review are
 
 24
 Denied.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 Such rates become, moreover, "base rates," which may be adjusted upward within statutorily prescribed limits without becoming subject to challenge for unreasonableness. See 49 U.S.C. Sec. 10707a
 
 
 [2]
 We assume without deciding that an agency "preside[s] at the reception of the evidence" when it receives written evidence. The phrase is assuredly strange to connote that meaning; the drafters obviously had immediately in mind the oral proceedings that characterize formal adjudication. See, e.g., H.R.REP. NO. 1980, 79th Cong., 2d Sess. 38 (1946), reprinted in LEGISLATIVE HISTORY OF THE ADMINISTRATIVE PROCEDURE ACT at 272 (1946) ("Leg.Hist.")
 
 
 [3]
 Petitioners' amended complaint challenged the rates on three grounds: 1) that they exceeded a maximum reasonable level in violation of 49 U.S.C. Sec. 10701(a); 2) that the successive ex parte general increases producing them had resulted in disruption and distortion of the transcontinental rate structure constituting an unreasonable practice in violation of 49 U.S.C. Sec. 10701(a) and in violation of the Commission's orders; and 3) that such increases had disproportionately increased rates for aluminum ingot traffic, constituting undue and unjust discrimination in violation of 49 U.S.C. Sec. 10741(b). The Commission held that on the third claim--unjust discrimination--petitioners failed to meet their burden of proof. 367 I.C.C. at 489. Petitioners do not appeal that decision. The second claim--that of an unreasonable practice--was not mentioned in the Commission's decision, but petitioners have not raised it on this appeal. The only remaining contention is that the rates are unreasonably high. The Commission did not consider the level of the rates since it found against petitioners on the threshold question of market dominance
 
 
 [4]
 This directive was contained in Sec. 202(b) of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4R Act"), Pub.L. No. 94-210, 90 Stat. 35 (1976), codified at 49 U.S.C. Sec. 1(5)(d) (1976). That provision, which required the rules to be promulgated within 240 days after enactment of the 4R Act, was repealed (after an initial version of the rules, though not the version here relevant, had been promulgated) by Pub.L. No. 95-473, Sec. 4(b), (c), 92 Stat. 1466-70 (1978)
 
 
 [5]
 It is not disputed that the competing products relevant in the present case move over different lines